991 F.2d 1049
 126 Lab.Cas. P 57,480
 WHITE PLAINS TOWING CORP. d/b/a Don's Towing and Don
Cherico, Plaintiffs-Appellees-Cross-Appellants,
v.
James G. PATTERSON, Defendant,
Harold J. Wright and E.P. Streider,
Defendants-Appellants-Cross-Appellees.
 Nos. 469, 566, Dockets 92-7617, 92-7663.
 United States Court of Appeals,
Second Circuit.
 Argued Nov. 17, 1992.
Decided April 21, 1993.
 
 Alan E. Wolin, Hicksville, NY (Lecci, Wolin & Wolin, on the brief), for plaintiffs-appellees-cross-appellants.
 Alex Caspari, Asst. Atty. Gen. of the State of N.Y., New York City (Robert Abrams, Atty. Gen., Frederic L. Lieberman, Asst. Atty. Gen., on the brief), for defendants-appellants-cross-appellees.
 Before: LUMBARD, FEINBERG, and KEARSE, Circuit Judges.
 KEARSE, Circuit Judge:
 
 
 1
 Defendants Harold J. Wright and E.P. Streider ("defendants"), who at the pertinent times were New York State Police ("State Police") officers, appeal from a judgment entered in the United States District Court for the Southern District of New York following a one-day bench trial before Charles L. Brieant, then-Chief Judge, awarding plaintiffs White Plains Towing Corp. ("WP Towing") and its president Don Cherico (collectively "Cherico") $1 in nominal damages and $22,700 in attorney's fees on their claims under 42 U.S.C. § 1983 (1988) that defendants caused the State Police to discontinue a service relationship with WP Towing, in violation of plaintiffs' rights under the First Amendment and the Due Process Clause of the Fourteenth Amendment to the Constitution. On appeal, defendants contend principally (1) that the district court erred in ruling that plaintiffs' First Amendment and due process rights were violated, and (2) that defendants were, in any event, entitled to dismissal of the due process claims on the ground of qualified immunity. Plaintiffs cross-appeal, contending principally that the district court erred in refusing to award more than nominal damages. For the reasons below, we conclude that plaintiffs' First Amendment claims and certain of their due process claims lacked merit and that defendants were entitled to dismissal of the remaining due process claims on the ground of qualified immunity. Accordingly, we reverse the judgment of the district court.
 
 I. BACKGROUND
 
 2
 Troop K of the State Police is responsible for securing the safety of members of the motoring public on highways within its jurisdiction. Interstate Route I-287 in Westchester County, New York, commonly known as the Cross-Westchester Expressway ("I-287" or "Expressway"), is within the jurisdiction of the State Police Station in Hawthorne, New York. Wright was a State Police lieutenant; Streider was a sergeant; both were assigned to the Hawthorne Station. Cherico was in the business of providing towing services. The present controversy arises from the 1985 decision of Wright and Streider to terminate Troop K's highway towing assignments to Cherico. Many of the facts are undisputed.
 
 A. The Events
 
 3
 For the purpose of assisting motorists with disabled vehicles, Troop K divided the 11-mile-long I-287 into three zones and assigned each zone to one towing company that would, when summoned, provide service. These assignments gave the towing company the exclusive right to towing referrals in its own zone to the extent that, unless a disabled motorist requested otherwise, the State Police dispatched the towing company assigned to that zone to render aid. The parties stipulated that "the tower/wrecker dispatch system administered by Troop K for I-287 ... is not specifically authorized by, or codified in any statute or in any regulation of the State Police"; that "participation in the Troop K tower/wrecker dispatch system is not contractual in nature; and that assignments are not made or awarded based on bid; and that tow operators are not specifically licensed or issued permits by the State Police to operate or to provide services under the Troop K tower/wrecker dispatch system." (Stipulation dated May 30, 1991 ("Stipulation"), pp 9, 13.)
 
 
 4
 Troop K first assigned one zone of I-287 to Cherico for a two-day period in 1984. Some months later in 1984, Cherico was again assigned a section of I-287, which it serviced for the next 9-12 months. During the latter period, plaintiffs orally and in writing made repeated demands to defendants for a larger share of the towing assignments on I-287 and another highway. In addition, on or about April 19, 1985, plaintiffs lodged a formal complaint with the State Police against Wright and Streider, alleging that those defendants had impugned Cherico's reputation by stating that he was a " 'thief', 'no good' and associated with organized crime.... [P]laintiffs' complaint resulted in a formal State Police investigation; ... thereafter, Mr. Cherico withdrew his complaint." (Stipulation p 21.)
 
 
 5
 In July 1985, by letter dated July 26, Wright informed Cherico that his I-287 assignment would be terminated on July 31, 1985. The letter stated that Troop K would not summon Cherico for a towing job unless the motorist specifically requested him.
 
 
 6
 Wright informed his supervisor of this action in a brief communication enclosing a memorandum prepared by Streider (the "Streider Memorandum" or "Memorandum") detailing reasons for the termination. The Streider Memorandum identified the towing companies to which the three I-287 zones were then assigned and stated that the towing operators other than Cherico had not made any complaints, "nor have they been complained about by motorists. However, DON CHERICO is another matter." The Memorandum set forth the following chronology of specific incidents involving plaintiffs: (a) in October 1984, Troop K received a complaint from an insurance company that Cherico had billed nearly $15,500 for tow work on a tractor trailer, and that he had refused to release the truck's cargo in order to force payment of his charges; (b) in January 1985, a motorist complained that despite a sign on Cherico's truck stating that storage charges were $5 a day, Cherico charged the motorist $10 a day; (c) on April 18, 1985, Cherico made a personnel complaint against Wright and Streider, alleging that they had stated that he was connected with organized crime; "[o]n April 22, 1985, the complainant appeared at Troop K Headquarters to retract his complaint and the matter was closed as unfounded"; (d) in June 1985, one Walter R. May wrote a letter of complaint against one of the towing companies assigned to another part of the Expressway; another State Police sergeant conducted an investigation and discovered that the complaint was unfounded; May then admitted that he had lodged the unfounded charge at the request of Cherico; and (e) on July 18, 1985, troopers found a van with no license plates abandoned on I-287 in one of the zones not served by Cherico; the tow operator assigned to that zone said he had seen the van being towed two days earlier by a WP Towing truck driven by Cherico's son; further investigation turned up a scrap metal dealer who gave deposition testimony that on July 18, Cherico's son tried to sell the van to him, but he declined it as worthless; Cherico's son thereupon towed it away.
 
 
 7
 After detailing these incidents, the Streider Memorandum concluded as follows:
 
 
 8
 Since Mr. CHERICO was permitted by the State Police to use his tow trucks on I-287, he has been nothing but a source of annoyance and embarrassment to the New York State Police. His constant complainant [sic] that he doesn't get enough work has been discussed with him over and over again. He has caused needless time expenditure by SP Hawthorne station supervisory personnel, Zone 4 supervisory personnel, Troop supervisory personnel and personnel at Division Headquarters. Many fruitless hours have been spent in investigations, interviews, and report writing, reading and reviewing. Mr. CHERICO is a potential source of embarrassment as he does not possess the proper driver's license to operate some of his equipment. Attempts by members to find Mr. CHERICO in such an unlicensed situation have thus far proved fruitless, as he utilizes other drivers.
 
 
 9
 It is not within the best interests of the Division of State Police to have a person of Mr. CHERICO's ilk providing services to the users of an interstate highway patrolled solely by the State Police. His services are therefore being terminated effective close of business July 31, 1985.
 
 
 10
 Wright, in his July 26, 1985 letter to Cherico, did not offer plaintiffs a formal opportunity to contest the decision. Cherico testified that officers to whom he complained said they had been instructed not to call Cherico because his brother had been arrested for attempted murder and his family was tied to organized crime. Plaintiffs filed complaints with the State Police and the Office of the Governor. These efforts to gain reassignment were unsuccessful, and in 1986 plaintiffs commenced the present action under 42 U.S.C. § 1983.
 
 B. The Pretrial Proceedings
 
 11
 The original complaint alleged principally that Wright and Streider, along with other defendants against whom the action was subsequently dismissed by stipulation or order, had (a) conspired to deprive plaintiffs of towing business on I-287, and (b) "made scurilous [sic ], defamatory and false accusations against [Cherico's] character and his family's character." The complaint asserted that defendants' actions violated plaintiffs' rights under the Due Process, Equal Protection, and Privileges and Immunities Clauses of the Constitution. An amended complaint added allegations that defendants had terminated the assignment to Cherico because of plaintiffs' complaints and demands for more towing assignments, and it asserted that the termination therefore deprived plaintiffs of their First Amendment rights "to free speech and to petition governmental authorities for the redress of grievances." Plaintiffs sought declaratory and injunctive relief, as well as compensatory and punitive damages.
 
 
 12
 Defendants moved under Fed.R.Civ.P. 12(b)(6) to dismiss the amended complaint for failure to state a claim on which relief can be granted. District Judge Vincent L. Broderick, to whom the case was then assigned, referred the motion to Magistrate Judge Leonard A. Bernikow, who, in a Report and Recommendation dated July 15, 1988 ("Magistrate's Report" or "Report"), recommended that the motion be granted in part and denied in part. The Magistrate's Report recommended that the due process claims be dismissed on two grounds: (a) that plaintiffs had no protected property interest in towing referrals, because, inter alia, they did not have an express contract or license to provide towing services, and any implied contract would have been terminable at will; and (b) that plaintiffs failed to allege that they were deprived of a protected liberty interest in their reputation because, inter alia, the complaint did not identify the alleged "scurrilous, defamatory and false accusations" and did not allege that the accusations were publicized. The Report recommended that the equal protection claims be dismissed because the complaint did not sufficiently allege "a policy, practice or procedure violative of equal protection." As to the First Amendment claims, the Report concluded that the complaint stated a claim insofar as plaintiffs alleged that they were denied benefits in response to their statements on matters of public concern. Although the Report concluded that plaintiffs' demands for more business were merely "commercial grievances" that could not form the basis of a First Amendment claim, it viewed Cherico's April 1985 personnel complaint against Wright and Streider as an exercise of the right to petition the government and concluded that plaintiffs' assertion that that complaint was a substantial or motivating factor in plaintiffs' termination presented a cognizable First Amendment claim.
 
 
 13
 In an Order dated July 14, 1990, Judge Broderick adopted the Magistrate's Report and dismissed the due process and equal protection claims, the latter without prejudice. Thereafter, plaintiffs filed two additional amended complaints asserting claims under 42 U.S.C. §§ 1983 and 1985, the Equal Protection Clause, and the First Amendment. The final amended complaint did not include a due process claim.
 
 C. The Decision of the Trial Court
 
 14
 In late 1991, the case was reassigned to then-Chief Judge Brieant, who presided over a one-day bench trial. Following the trial, Judge Brieant dismissed plaintiffs' equal protection claims but found Wright and Streider liable for violations of plaintiffs' rights under the First Amendment and the Due Process Clause.
 
 
 15
 In an oral decision from the bench, the court ruled as follows with respect to the First Amendment claims:
 
 
 16
 [S]ome of the speech in which [Cherico] engaged was protected speech. I don't doubt that some of the speech in which he engaged was inappropriate conduct, and there comes a point where unfounded charges of not receiving [a] fair share of the work which takes up needless time and effort by supervisory people can become a ground for discharge, even if it is speech which otherwise might be privileged; however, the Court believes that insofar as there's any reference in [the Streider Memorandum] to the charges or the personnel complaint made, that was absolutely privileged, and the fact that it's even referred to in the report substantiates the testimony here that their reactions to it were "ambivalent."
 
 
 17
 (Transcript, December 11, 1991 ("Tr."), at 183.) In a subsequent elaboration, the court stated:
 
 
 18
 The Court finds that--so that I can be absolutely clear about it--that the First Amendment aspect of the case having to do with the accusations he made in the context of public employment did have some slight part in the motivating factor of this decision two weeks later [sic ] to terminate the services. The Court is not prepared to say it ... was the overwhelming factor, but it was a substantial motivating factor in the resolution of this matter.
 
 
 19
 (Tr. 186.)
 
 
 20
 The principal violation found by the trial court was a deprivation of procedural due process: "the weight and strength that [the First Amendment] claim has in my view of the matter is ... not nearly as great as the procedural due process issue...." (Tr. 196.) With respect to due process, the court found that plaintiffs enjoyed protectable interests in their reputation and in their towing assignment:
 
 
 21
 Mr. Cherico was never an employee of the state. He was, rather, a designated exclusive provider to transients requiring towing service in this particular segment of the highway who did not have their own towing service which they wished to request.
 
 
 22
 .... The rights that he enjoyed there, while they were purely oral, and had no termination provided in them and were indefinite as to duration, were essentially equal to a franchise, and other towing companies enjoyed theirs for many, many, many, many years.
 
 
 23
 So that the Court finds that the deprivation involved here extended to a livelihood of government designation as a commercial tower to be employed by people who happened to need towing service during that portion of the highway, and they deprived him of that employment and also tarnished his individual and commercial reputation.
 
 
 24
 (Tr. 175-76.) It concluded that plaintiffs possessed "allocated rights" in the assigned section of Expressway that were "almost equivalent to employment." (Tr. 184.)
 
 
 25
 The court noted that the Streider Memorandum had detailed a number of grounds for terminating the assignment to plaintiffs and that Wright and Streider had "said that Mr. Cherico was associated with the Mafia, that he was a thief, and that he was ripping off the public by means of excess overcharges." (Tr. 174.) The court also found that
 
 
 26
 the evidence shows that after his termination the defendant[s] advised other persons that they were not using his services for various reasons, including his disreputable character and his overcharges.
 
 
 27
 (Tr. 175-76.) In a subsequent written Memorandum & Order dated February 20, 1992 ("1992 Opinion"), the court reiterated that
 
 
 28
 after [Cherico's] termination, defendants maligned his reputation by advising persons other than those with decision making authority that the State Police were not using Mr. Cherico's services for several reasons, including his disreputable character and his business practices.
 
 
 29
 1992 Opinion at 4. The court concluded that these statements by Wright and Streider, plus the fact that defendants did not afford plaintiffs an opportunity to explain any of the matters detailed in the Streider Memorandum, violated plaintiffs' due process rights:
 
 
 30
 Essentially, the Court finds that the plaintiff was denied procedural due process and that he was denied an opportunity to have a hearing and an opportunity to clear his commercial and individual name of the totality of these charges of wrongdoing which are listed against him in the [Streider Memorandum].
 
 
 31
 ....
 
 
 32
 In order to satisfy the constitutional standards for due process, in order to deprive this plaintiff of his allocated rights in this particular three-mile section of highway, it was necessary at the very least that either Mr. Str[ei]der or Mr. Wright would have confronted him with each of these items relied on in [the Streider Memorandum] and given him an opportunity to explain or answer to these charges. I am convinced that had this opportunity been given, some of the charges could have been explained. Probably some of them could not.
 
 
 33
 The totality of what took place here was a denial of procedural due process involving an important right having to do with the protected interest of his good name as well as the commercial relationship, which is almost equivalent to employment.
 
 
 34
 (Tr. 183-84.)
 
 
 35
 Notwithstanding its rulings as to liability, the court concluded that "there is hardly any evidence here in support of any actual damages." (Tr. 185.) "There's no way, short of speculation, that the Court could ascertain with any certainty what his actual damages were for this loss. And furthermore, the Court can't speculate as to how long he would have continued the franchise there...." (Id.) Accordingly, with respect to claims under both the First Amendment and the Due Process Clause, the court ruled that plaintiffs were entitled only to nominal damages in the amount of $1, plus an award of attorney's fees.
 
 
 36
 Following the court's announcement of its oral decision, Wright and Streider promptly objected to the due process ruling, pointing out that those claims had been dismissed by Judge Broderick, with prejudice, prior to trial. The trial court responded that it was vacating Judge Broderick's order because it viewed the due process violation as clear and outrageous. After colloquy, the court offered defendants the opportunity to present evidence with respect to the due process claims.
 
 D. The Ruling on Qualified Immunity
 
 37
 Wright and Streider decided not to offer evidence on the due process claims and instead moved for reconsideration on the basis that they had pleaded a defense of qualified immunity and that the claims should be dismissed on that ground. They contended that they had violated no clearly established right of which they should have known. They also sought reconsideration of the liability ruling with respect to the First Amendment claims on the qualified immunity ground and on the ground that those claims were not proven.
 
 
 38
 In its 1992 Opinion, the court denied the motion for reconsideration, concluding that Wright and Streider were not entitled to qualified immunity:
 
 
 39
 As early as 1972, the United States Supreme Court had recognized that a liberty interest is involved and due process required where, as here, the state terminates or fails to renew an individual's employment and accompanies that action with the publication of false or stigmatizing information. Board of Regents v. Roth, 408 U.S. 564, 573-74 [92 S.Ct. 2701, 2707, 33 L.Ed.2d 548] (1972); Bishop v. Wood, 426 U.S. 341, 348 [96 S.Ct. 2074, 2079, 48 L.Ed.2d 684] (1976); Codd v. Velger, 429 U.S. 624 [97 S.Ct. 882, 51 L.Ed.2d 92] (1977). This Court therefore concludes that the established law in 1985 and at the time the defendants terminated plaintiffs' towing franchise based on unsubstantiated accusations, including accusations made known to persons outside the chain of command that Mr. Cherico was associated with the Mafia and a "thief", required procedural due process in the form of a hearing.
 
 
 40
 1992 Opinion at 6-7.
 
 
 41
 Judgment was entered (1) holding, inter alia, that Wright and Streider (a) denied plaintiffs procedural due process by failing to grant them a hearing before terminating their towing services, and (b) denied plaintiffs their rights to free speech and to petition the New York State Police for the redress of their grievances, and (2) ordering Wright and Streider to pay plaintiffs $1 in damages plus $22,700 as reasonable counsel fees.
 
 
 42
 Wright and Streider have appealed from so much of the judgment as held them liable to plaintiffs; plaintiffs have cross-appealed from so much of the judgment as awarded them only nominal damages.
 
 II. DISCUSSION
 
 43
 On their appeal, Wright and Streider contend principally that the trial court erred (1) in ruling that plaintiffs were deprived of their First Amendment and due process rights, and (2) in rejecting defendants' qualified immunity defense to the due process claims. For the reasons below, we conclude that the First Amendment claims and certain of the due process claims should have been dismissed on the merits and that, even if there was a violation of plaintiffs' due process rights, defendants had qualified immunity. Having reached these conclusions, we dismiss plaintiffs' cross-appeal on the question of damages as moot.
 
 A. The First Amendment Claim
 
 44
 A public employer enjoys wide latitude in managing its office, see Connick v. Myers, 461 U.S. 138, 146, 103 S.Ct. 1684, 1689, 75 L.Ed.2d 708 (1983), and therefore has "a legitimate interest in regulating the speech of its employees that differs significantly from its interest in regulating the speech of people in general," Piesco v. City of New York, Dept. of Personnel, 933 F.2d 1149, 1155 (2d Cir.), cert. denied, --- U.S. ----, 112 S.Ct. 331, 116 L.Ed.2d 272 (1991); see Connick v. Myers, 461 U.S. at 140, 103 S.Ct. at 1686; Pickering v. Board of Education, 391 U.S. 563, 568, 88 S.Ct. 1731, 1734, 20 L.Ed.2d 811 (1968). The public employer's right to discharge an employee for exercising his First Amendment right to freedom of speech, even if the employee could have been discharged without cause, is nonetheless circumscribed. See Rankin v. McPherson, 483 U.S. 378, 383-84, 107 S.Ct. 2891, 2896, 97 L.Ed.2d 315 (1987); Mt. Healthy City School District Board of Education v. Doyle, 429 U.S. 274, 283-84, 97 S.Ct. 568, 574, 50 L.Ed.2d 471 (1977); Perry v. Sindermann, 408 U.S. 593, 597-98, 92 S.Ct. 2694, 2698, 33 L.Ed.2d 570 (1972). "The determination whether a public employer has properly discharged an employee for engaging in speech requires 'a balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.' " Rankin v. McPherson, 483 U.S. at 384, 107 S.Ct. at 2896-97 (quoting Pickering v. Board of Education, 391 U.S. at 568, 88 S.Ct. at 1734-35).
 
 
 45
 Accordingly, a public employee who seeks to recover on the ground that he has been discharged because of the exercise of his First Amendment speech rights must establish, as an initial matter, that his speech may be " 'fairly characterized as constituting speech on a matter of public concern.' " Rankin v. McPherson, 483 U.S. at 384, 107 S.Ct. at 2897 (quoting Connick v. Myers, 461 U.S. at 146, 103 S.Ct. at 1689); see Ezekwo v. NYC Health & Hospitals Corp., 940 F.2d 775, 781 (2d Cir.), cert. denied, --- U.S. ----, 112 S.Ct. 657, 116 L.Ed.2d 749 (1991). "When employee expression cannot be fairly considered as relating to any matter of political, social, or other concern to the community, government officials should enjoy wide latitude in managing their offices, without intrusive oversight by the judiciary in the name of the First Amendment." Connick v. Myers, 461 U.S. at 146, 103 S.Ct. at 2897.
 
 
 46
 Certain categories of speech are less likely than others to involve matters of public concern. For example, "commercial" speech, i.e., speech that merely proposes commercial transactions, see, e.g., City of Cincinnati v. Discovery Network, Inc., --- U.S. ----, ----, 113 S.Ct. 1505, 1512-13, 123 L.Ed.2d 99 (1993); Board of Trustees v. Fox, 492 U.S. 469, 473-74, 109 S.Ct. 3028, 3031, 106 L.Ed.2d 388 (1989); Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council, Inc., 425 U.S. 748, 762, 96 S.Ct. 1817, 1826, 48 L.Ed.2d 346 (1976), may have little or no relevance to matters of public concern. See, e.g., id. at 764, 96 S.Ct. at 1827 ("not all commercial messages contain the same or even a very great public interest element"). See also Board of Trustees v. Fox, 492 U.S. at 477, 109 S.Ct. at 3033 (commercial speech enjoys " 'a limited measure of protection' " (quoting Ohralick v. Ohio State Bar Assn., 436 U.S. 447, 456, 98 S.Ct. 1912, 1918, 56 L.Ed.2d 444 (1978))); Central Hudson Gas & Electric Corp. v. Public Service Commission, 447 U.S. 557, 562-63, 100 S.Ct. 2343, 2350, 65 L.Ed.2d 341 (1980) ("The Constitution ... accords a lesser protection to commercial speech than to other constitutionally guaranteed expression.").
 
 
 47
 Within this framework, a police department's employment policies, for example, are a matter of public concern, see Piesco v. City of New York, Dept. of Personnel, 933 F.2d at 1157; but an assistant district attorney's personal desire for a particular assignment is not a matter of public concern, see Connick v. Myers, 461 U.S. at 148, 103 S.Ct. at 1691; see also id. at 149, 103 S.Ct. at 1691 ("First Amendment does not require a public office to be run as a roundtable for employee complaints over internal office affairs"); Ezekwo v. NYC Health & Hospitals Corp., 940 F.2d at 781 (medical resident's complaints regarding her treatment in residency program did not address matters of public concern). "[W]hen a public employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters only of personal interest, absent the most unusual circumstances, a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior." Connick v. Myers, 461 U.S. at 147, 103 S.Ct. at 1690.
 
 
 48
 Once the employee establishes that he has spoken as a citizen on a matter of public concern, he must also establish that that speech was at least a "substantial" or "motivating" factor in the discharge. Mt. Healthy City School District Board of Education v. Doyle, 429 U.S. at 287, 97 S.Ct. at 576. If the employee fails to prove either this causation element or the public-concern element, his First Amendment claim must fail.
 
 
 49
 If the employee carries these burdens, the employer can then escape liability in either of two ways. First, the employer is entitled to prevail if it demonstrates that it would have made the same employment decision in the absence of the protected conduct:
 
 
 50
 A borderline or marginal candidate should not have the employment question resolved against him because of constitutionally protected conduct. But that same candidate ought not to be able, by engaging in such conduct, to prevent his employer from assessing his performance record and reaching a decision not to rehire on the basis of that record, simply because the protected conduct makes the employer more certain of the correctness of its decision.
 
 
 51
 Id. at 286, 97 S.Ct. at 575; see also id. at 285-87, 97 S.Ct. at 575-76; Ezekwo v. NYC Health & Hospitals Corp., 940 F.2d at 780-81. Second, even if the employer does not establish that it would have discharged the employee in the absence of the protected conduct, it may nonetheless prevail if it can show that the employee's conduct interfered with the employer's "effective and efficient fulfillment of its responsibilities to the public." Connick v. Myers, 461 U.S. at 150, 103 S.Ct. at 1692. "[T]he State's burden in justifying a particular discharge varies depending upon the nature of the employee's expression," id., and the court must thus perform a balancing analysis, measuring, inter alia, the extent to which the employee's speech touched upon matters of public concern against the extent to which the employee's conduct interfered with the functioning of the workplace, see id. at 150-52, 103 S.Ct. at 1691-93; Rankin v. McPherson, 483 U.S. at 389, 107 S.Ct. at 2899. Even as to an issue that could arguably be viewed as a matter of public concern, if the employee has raised the issue solely in order to further his own employment interest, his First Amendment right to comment on that issue is entitled to little weight in the balancing analysis. See, e.g., Connick v. Myers, 461 U.S. at 154, 103 S.Ct. at 1694; Piesco v. City of New York, Dept. of Personnel, 933 F.2d at 1157 (explaining cases).
 
 
 52
 The First Amendment right to petition the government for a redress of grievances, which is "an assurance of a particular freedom of expression," McDonald v. Smith, 472 U.S. 479, 482, 105 S.Ct. 2787, 2789, 86 L.Ed.2d 384 (1985), is "generally subject to the same constitutional analysis" as the right to free speech, Wayte v. United States, 470 U.S. 598, 610 n. 11, 105 S.Ct. 1524, 1532 n. 11, 84 L.Ed.2d 547 (1985). Thus, right-to-petition claims are also governed by the above interest-balancing principles. See Schalk v. Gallemore, 906 F.2d 491, 498 (10th Cir.1990) (per curiam); Gray v. Lacke, 885 F.2d 399, 412 (7th Cir.1989), cert. denied, 494 U.S. 1029, 110 S.Ct. 1476, 108 L.Ed.2d 613 (1990); Day v. South Park Independent School District, 768 F.2d 696, 701 (5th Cir.1985), cert. denied, 474 U.S. 1101, 106 S.Ct. 883, 88 L.Ed.2d 918 (1986).
 
 
 53
 In the present case, although Cherico was not an employee of the State Police and had no formal franchise from or contract with the state, we will assume for purposes of First Amendment analysis that, as the trial court ruled, the assignment to Cherico was tantamount to employment. On this hypothesis, the trial court could properly find plaintiffs' First Amendment claims meritorious only if (1) Cherico's speech constituted comments upon a matter of public concern, (2) that speech was a substantial or motivating factor in defendants' termination of WP Towing's highway assignment, (3) defendants failed to show that they would have terminated that assignment even in the absence of that speech, and (4) defendants failed to show that the State Police interest in performing its duties outweighed Cherico's interest in speaking on matters of public concern. As discussed below, most of Cherico's speech failed to meet the first of these criteria, and the court's findings establish that defendants would have terminated Cherico's assignment even in the absence of the speech that did touch upon matters of public concern.
 
 
 54
 The vast majority of Cherico's communications to the State Police consisted simply of demands and complaints seeking an increase in towing referrals to WP Towing. These communications stated private commercial grievances that do not appear to relate to any matter of political, social, or other concern to the community and hence could not provide a basis for recovery. Even if they had any political or social relevance, the weight properly accorded them would have been minimal and Cherico's interest in soliciting more work would plainly have been outweighed by the interest of the State Police in allocating its resources to other functions. It was indisputable that Cherico's "constant" commercial demands had
 
 
 55
 caused needless time expenditure by SP Hawthorne station supervisory personnel, Zone 4 supervisory personnel, Troop supervisory personnel and personnel at Division Headquarters. Many fruitless hours have been spent in investigations, interviews, and report writing, reading and reviewing.
 
 
 56
 (Streider Memorandum.) That assessment was supported by Cherico's own testimony that one Troop K captain had "spent four days in my place of business looking at the operation" (Tr. 25), and that Cherico had made so many assignment complaints that he could not even remember whether the termination of the assignment to WP Towing had occurred before or after he made the personnel complaint (see Tr. 44 ("I don't recall, because I made numerous complaints.")). Thus, the trial court observed that
 
 
 57
 there comes a point where unfounded charges of not receiving [a] fair share of the work which takes up needless time and effort by supervisory people can become a ground for discharge, even if it is speech which otherwise might be privileged....
 
 
 58
 (Tr. 183.) Plainly the interest of the State Police in not allocating inordinate amounts of time to dealing with Cherico's demands for more work outweighed plaintiffs' interest in pursuing their private commercial goals. Plaintiffs' First Amendment claims could not be sustained on the basis of these demands.
 
 
 59
 Cherico's April 1985 personnel complaint against Wright and Streider, however, alleging that they mischaracterized Cherico as a dishonest operator and as having ties to organized crime, potentially enjoys a different status, for a state police corps' performance of its duties is a matter of public concern, and alleged defamation by state police officers of a citizen with whom the police department is doing business may well be a matter of interest to the community. Although Cherico's First Amendment interest in filing his short-lived personnel complaint would be weak if, as the trial record strongly suggests, he took that action solely to obtain additional towing referrals, the trial court did not err in ruling that the personnel complaint did at least minimally touch upon a matter of public concern.
 
 
 60
 The trial court also perhaps did not clearly err in finding that Cherico's personnel complaint against Wright and Streider was a "substantial motivating factor" in defendants' decision to terminate the assignment to WP Towing. We express some uncertainty as to this element because, as discussed below, the court found that the personnel complaint had caused defendants to be "ambivalent," that the role of Cherico's personnel complaint in that decision was "slight," and that the decision to terminate was based on other factors.
 
 
 61
 Even accepting, however, the proposition that Cherico's personnel complaint involved a matter of public concern and was a "substantial motivating factor" in defendants' decision to terminate WP Towing's assignment, we conclude that the trial court's analysis was incomplete, for the court did not go on to consider whether or not defendants would have terminated that assignment even had there been no personnel complaint. The court's other findings, which are amply supported by the evidence, compel the conclusion that defendants would indeed have terminated Cherico's towing referrals even in the absence of his short-lived personnel complaint. There was no dispute that Cherico's repeated demands for more assignments were one reason for defendants' decision to terminate the assignment to plaintiffs. The complaint so alleged, and the trial court so noted ("plaintiff[ ]s claim that ... the complaints that were made about the alleged unfair assignment made verbally by Mr. Cherico were a substantial motivating factor in the decision" (Tr. 173-74)). The civilian complaints against WP Towing, the discovery that Cherico had procured an unfounded complaint against one of his competitors, and the belief that Cherico was connected to organized crime were also plainly factors that caused defendants to terminate the towing assignment. Indeed, at trial, these factors and his chronic complaints were at first the only reasons proffered by Cherico for the termination; the proposition that his personnel complaint had played any role in the termination had to be dragged out of him by his attorney's leading question:
 
 
 62
 Q. Mr. Cherico, why do you believe you were removed from Interstate 287?
 
 
 63
 A. I believe I was removed because they said I was a criminal, my family was no good, and that I was ripping the public off.
 
 
 64
 Q. What, if any, effect did your complaints--you believe your complaints had to do with it?
 
 
 65
 A. I don't understand the question.
 
 
 66
 Q. The complaints that you made had something--
 
 
 67
 What, if any, effect do you believe your complaints had?
 
 
 68
 A. I guess they just didn't want to be bothered in answering any of the complaints.
 
 
 69
 Q. Is it your contention in this lawsuit that the complaint you made against Sergeant Strieder [sic] and Lieutenant Wright had something to do with it?
 
 
 70
 A. Yes.
 
 
 71
 (Tr. 26-27.) Thus, Cherico himself appeared to be of the view that the towing assignment was terminated because defendants believed he was dishonest, was connected to organized crime, and wasted official time with his demands for more work. Consistent with the tenor of this testimony, the court found that plaintiffs' filing of the personnel complaint was not an "overwhelming factor" but only played "some slight part in the motivating factor" for the termination. (Tr. 186.) We note also that the court found that the role of the personnel complaint was "slight" even while apparently believing that the termination of WP Towing's assignment occurred only "two weeks" (id.) after the personnel complaint was made. That belief was clearly erroneous in light of the stipulated facts that the complaint was made in April and the termination occurred in July. The complaint was withdrawn just days after it was lodged, and the actual more-than-three-month interval between the short-lived complaint and the assignment termination, together with intervening conduct by or attributable to Cherico (i.e., continued demands for more assignments, the solicitation of a false consumer complaint against one of his competitors, and the dumping of a worthless van in a competitor's territory) suggests that the role of the personnel complaint was even less than "slight." Indeed, in its 1992 Opinion, the court stated that Wright and Streider had
 
 
 72
 terminated plaintiffs' towing franchise based on unsubstantiated accusations, including accusations made known to persons outside the chain of command that Mr. Cherico was associated with the Mafia and a "thief."
 
 
 73
 1992 Opinion at 7. This finding, together with the findings that the personnel complaint had caused defendants to be "ambivalent" and its role in the decision to terminate was "slight," all of which are amply supported by the record, required the conclusion that defendants would have terminated the assignment to Cherico even had there been no personnel complaint.
 
 
 74
 Accordingly, we conclude that, even if plaintiffs' status were elevated to the level of state employee or franchisee, the trial court erred in ruling that plaintiffs' First Amendment rights had been violated.
 
 B. The Merits of the Due Process Claim
 
 75
 In order to succeed on a claim of deprivation of procedural due process, a plaintiff must establish that state action deprived him of a protected property or liberty interest. See, e.g., Mathews v. Eldridge, 424 U.S. 319, 332, 96 S.Ct. 893, 901, 47 L.Ed.2d 18 (1976). To have a property interest in a public benefit, a plaintiff "must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." Board of Regents v. Roth, 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972). Such property interests are "created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law." Id.
 
 
 76
 Under New York law, a contract for services that makes no specific provision for duration is presumed to be terminable at will. See, e.g., Murphy v. American Home Products Corp., 58 N.Y.2d 293, 305, 461 N.Y.S.2d 232, 237, 448 N.E.2d 86, 91 (1983) (employment contract); Haines v. City of New York, 41 N.Y.2d 769, 773, 396 N.Y.S.2d 155, 158, 364 N.E.2d 820, 822-23 (1977) ("exclusive agency, distributorship, or requirements contracts which have been analogized to employment contracts"). An interest that state law permits to be terminated at the whim of another person is not a property right that is protected by the Due Process Clause. See, e.g., Bishop v. Wood, 426 U.S. 341, 345-47, 96 S.Ct. 2074, 2078-79, 48 L.Ed.2d 684 (1976); Goetz v. Windsor Central School District, 698 F.2d 606, 608-09 (2d Cir.1983).
 
 
 77
 In the present case, the trial court appears to have found that plaintiffs' towing assignment constituted a property right that was protected by the Due Process Clause. It found that "[t]he rights that [plaintiffs] enjoyed there, while they were purely oral, and had no termination provided in them and were indefinite as to duration, were essentially equal to a franchise" (Tr. 176); that "the deprivation involved here extended to a livelihood of government designation" (id.); and that plaintiffs' "allocated rights in [a] particular three-mile section of highway," constituted a "commercial relationship, which is almost equivalent to employment" (Tr. 184). The record does not support the conclusion that these towing assignments were property rights protected by due process. The parties stipulated that the Troop K system for assigning segments of I-287 to towing operators was "not specifically authorized by, or codified in any statute or in any regulation of the State Police," that these assignments were "not contractual in nature," that the assignments were "not made or awarded based on bid[s]," and that the towing operators thus assigned were "not specifically licensed or issued permits by the State Police to operate or to provide services under the Troop K tower/wrecker dispatch system." (Stipulation pp 9, 13.) The informal arrangement resulting from the assignment system contained no specificity as to the duration of the relationship, and whatever an individual towing operator's hopes or expectations, the record showed that the assignment could be, as it was once for Cherico himself in 1984, as short as two days. Under New York law, therefore, this plainly was a relationship that was terminable at will. Accordingly, regardless of their unilateral hopes or expectations, plaintiffs had no cognizable property interest in continued towing referrals on I-287, and the mere termination of their status thus did not deprive them of a due-process-protected interest.
 
 
 78
 In addition, we should note that to the extent that the trial court relied on its finding that defendants maligned Cherico's reputation after Cherico's termination, see Tr. 175-76; 1992 Opinion at 4, that conduct was an insufficient basis for a finding of due process violation. Injury to reputation alone, even when inflicted by a state official, does not deprive an individual of a liberty or property interest protected by due process, see Paul v. Davis, 424 U.S. 693, 712, 96 S.Ct. 1155, 1166, 47 L.Ed.2d 405 (1976), and hence, the defamation of a former public employee after the termination of the employment relationship does "not ... trigger due process rights," Gentile v. Wallen, 562 F.2d 193, 198 (2d Cir.1977). Rather, "some 'stigma plus' is required to establish a constitutional deprivation." Easton v. Sundram, 947 F.2d 1011, 1016 (2d Cir.1991), cert. denied, --- U.S. ----, 112 S.Ct. 1943, 118 L.Ed.2d 548 (1992).
 
 
 79
 We think the district court correctly viewed plaintiffs as having sought to prove "stigma plus," for the potential injury to their reputation stemming from defendants' characterization of Cherico as dishonest or as related to organized crime, combined with his status as an exclusive assignee of towing rights on a portion of the Expressway, may have sufficed to give plaintiffs a liberty interest that could not properly be terminated without a hearing. Even a person who has no property right in continued employment may have a due-process-protected liberty interest in not being dismissed "based on charges 'that might seriously damage his standing and associations in his community' or that might impose 'on him a stigma or other disability that foreclose[s] his freedom to take advantage of other employment opportunities.' " Brandt v. Board of Cooperative Educational Services, Third Supervisory District, Suffolk County, New York, 820 F.2d 41, 43 (2d Cir.1987) (quoting Board of Regents v. Roth, 408 U.S. at 573, 92 S.Ct. at 2707). The right not to be so defamed is not limited to situations involving termination of employment; it extends as well to defamation occurring in the course of " 'termination of some other legal right o[r] status.' " Easton v. Sundram, 947 F.2d at 1016 (quoting Neu v. Corcoran, 869 F.2d 662, 667 (2d Cir.), cert. denied, 493 U.S. 816, 110 S.Ct. 66, 107 L.Ed.2d 33 (1989)).
 
 
 80
 To demonstrate such a due process violation, however, the plaintiff must also establish that the stigmatizing charges were publicized. See Bishop v. Wood, 426 U.S. at 348-49, 96 S.Ct. at 2079; Brandt v. Board of Cooperative Educational Services, Third Supervisory District, Suffolk County, New York, 820 F.2d at 43. Recovery is limited "to those instances where the stigmatizing charges made in the course of discharge have been or are likely to be disseminated widely enough to damage the discharged employee's standing in the community or foreclose future job opportunities." Id. at 44.
 
 
 81
 Here, even assuming arguendo that plaintiffs established that their terminable-at-will status was sufficient to constitute the "plus" element of the "stigma plus" standard, judgment in their favor was inappropriate since the trial court did not make a finding that there had been any dissemination of defendants' stigmatizing statements sufficient to affect plaintiffs' standing in the community or to foreclose future job opportunities. Nor would such a finding have been supported by the record, for there appears to be no evidence that defendants made the critical statements to the public in general, or to any member of the public in particular, or to any person inquiring as to plaintiffs' towing operations. Indeed, Wright's letter notifying plaintiffs of the termination stated that if a motorist specifically requested its services, WP Towing would be called. With respect to publication, the trial court found only that defendants made the statements to other police officers who were not decisionmakers as to towing assignments. Given that the primary function of a police force is law enforcement, we doubt that police officers' informing other police officers, even those without authority to make employment decisions, that a given individual has been accused of being dishonest or is believed to have ties to organized crime can constitute a sufficient publication to warrant a ruling that the individual's liberty interest has been impermissibly infringed.
 
 
 82
 We need not, however, decide whether communication from police officer to police officer constitutes such an infringing publication, for it is quite clear that defendants were entitled to qualified immunity with respect to this claim.
 
 C. The Qualified Immunity Defense
 
 83
 The doctrine of qualified immunity shields state officials from liability for damages if their actions did not violate "clearly established statutory or constitutional rights of which a reasonable person would have known," Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982), or even where the rights were clearly established, if it was objectively reasonable for defendants to believe that their acts did not violate those rights, see Anderson v. Creighton, 483 U.S. 635, 638, 107 S.Ct. 3034, 3038, 97 L.Ed.2d 523 (1987); Robison v. Via, 821 F.2d 913, 921 (2d Cir.1987). An official does not have such immunity where the "contours of the right" were "sufficiently clear that a reasonable official would understand that what he is doing violates that right." Anderson v. Creighton, 483 U.S. at 640, 107 S.Ct. at 3039; see, e.g., Bass v. Coughlin, 976 F.2d 98, 99 (2d Cir.1992) (per curiam); Vasbinder v. Ambach, 926 F.2d 1333, 1341 (2d Cir.1991). To determine whether a particular right was clearly established at the time defendants acted, a court should consider:
 
 
 84
 (1) whether the right in question was defined with "reasonable specificity"; (2) whether the decisional law of the Supreme Court and the applicable circuit court support the existence of the right in question; and (3) whether under preexisting law a reasonable defendant official would have understood that his or her acts were unlawful.
 
 
 85
 Jermosen v. Smith, 945 F.2d 547, 550 (2d Cir.1991), cert. denied, --- U.S. ----, 112 S.Ct. 1565, 118 L.Ed.2d 211 (1992).
 
 
 86
 There are two facets to the present case requiring that defendants be accorded qualified immunity against plaintiffs' due process claims. First, because WP Towing's exclusive assignment as towing operator for part of I-287 was a nontraditional relationship and was terminable at will, it could not have been clear whether that assignment provided plaintiffs with a status sufficient to give them a due-process-protected liberty interest in avoiding termination without a name-clearing hearing. Second, even if this question were answered in the affirmative, there remains the question whether the communication by one police officer to another police officer of a charge that a given individual has performed dishonestly or of the belief that the individual has ties to organized crime can constitute a publication sufficient to violate the individual's liberty interest. This Court has never answered that question; we are not aware of any other court that has answered it; and as indicated above, we would be surprised to find it answered in the affirmative.
 
 
 87
 In sum, defendants were entitled to qualified immunity with respect to plaintiffs' claim that the assignment to WP Towing could not, consistent with due process, be terminated without a hearing.
 
 CONCLUSION
 
 88
 We have considered all of plaintiffs' contentions in opposition to the appeal and have found them to be without merit. For the foregoing reasons, the judgment of the district court in plaintiffs' favor is reversed. The cross-appeal is dismissed as moot. Judgment shall be entered dismissing the complaint.
 
 
 89
 LUMBARD, Circuit Judge, concurring in part and dissenting in part:
 
 
 90
 I concur with the majority as to the due process claim, but dissent as to the First Amendment claim.
 
 
 91
 In reversing judgment for the plaintiffs, the majority finds that the district court failed to apply the proper legal standard. See Mt. Healthy City Bd. of Ed. v. Doyle, 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977) (employer may avoid liability if it demonstrates by a preponderance of the evidence that it would have reached the same decision absent the protected conduct). The majority nevertheless concludes that the district court's findings "compel" rejection of the plaintiffs' claim. I disagree.
 
 
 92
 Defendants must prove that they would have terminated Cherico even absent the personnel complaint. In light of the district court's finding that Cherico's complaint was a "substantial motivating factor" in the defendants' decision to cancel the referrals, I cannot conclude, on this record, that defendants have met their burden of proof. Therefore, I believe the more appropriate course is to remand this matter to the district court for further findings.