**Thomas PAPPAS, Plaintiff,**

v.

**Rudolph GIULIANI, Mayor of the City of New York, Howard Safir, Commissioner of the Police Department of the City of New York, and the City of New York Defendants.**

No. 00 Civ. 0320(NRB).

United States District Court, S.D. New York.

Oct. 26, 2000.

Alan I. Friess, Rosemary Carroll, Carroll & Friess, New York City, for plaintiff.

Bryan D. Glass, Assistant Corporation Counsel, New York City, for defendant.

## OPINION AND ORDER

BUCHWALD, United States Magistrate Judge.

Plaintiff Thomas Pappas ("Pappas"), a former police officer for Police Department of the City of New York (the "NYPD" and the "City," respectively), has brought this action for monetary and injunctive relief, pursuant to 42 U.S.C. § 1983 ("§ 1983"), alleging that defendants Rudolph Giuliani, the City's Mayor, Howard Safir, former Commissioner of the NYPD, and the City terminated his employment in violation of his First Amendment rights. Now pending is defendants' motion, pursuant to Fed.R.Civ.P. 56, for summary judgment on the grounds that: (1) plaintiff is precluded from relitigating the same facts and issues he unsuccessfully raised in a prior administrative hearing; (2) plaintiff's actions did not constitute protected speech under the First Amendment; and (3) the named defendants lacked the

requisite personal involvement in plaintiff's termination, or otherwise are entitled to qualified immunity. For the reasons stated below, defendants' motion is granted and plaintiff's complaint is dismissed.

## FACTS

Plaintiff was employed by the NYPD from January 25, 1982 until his termination on August 18, 1999.[1] He spent five years as a patrol officer before he was transferred to the Management Information Systems Division (MISD) where he worked as a civilian-clothed computer operator. In his MISD employment, he had no direct contact with the public, although he testified that he could have been reassigned to patrol duty at any time.

Off-duty, plaintiff was a member and the chairman since 1987 of the Populist Party of the Town of North Hempstead. The Populist Party advocated, *inter alia,* repeal of the Federal Income Tax, dismantling the Internal Revenue Service, and ending free trade. Plaintiff also reported being a member of the Liberty Lobby and a subscriber to The National Association for the Advancement of White People (NAAWP), The Resistance published by the National Socialist White People's Party (NSWPP), The Spotlight, the National Educator, and Truth at Last.

On at least two occasions in 1996 and 1997, plaintiff, then a police officer with the NYPD, mailed certain written materials to the Mineola Auxiliary Police Department (MAPD) in response to the MAPD's solicitation campaign.[2] The materials consisted of various articles and cartoons which the MAPD considered "offensive" antisemitic and anti-black hate mail.[3] The

1. Unless otherwise noted, facts are drawn from the plaintiff's testimony and the undisputed exhibits introduced during plaintiff's February 22, 1999 disciplinary hearing before Commissioner Josefina Martinez and plaintiff's testimony during his March 24, 1998 interrogation by Detective Nowack of Internal Affairs.

2. Plaintiff sent the mailings in the return envelope provided by MAPD. The replies bore no return address or indication that plaintiff

was a police officer. They were traced back to plaintiff by the Honest Balloting Corporation ("HBC") which was retained by the Nassau County Police Department to investigate the mailings. The HBC sent coded mailings to plaintiff and confirmed that he was the source of the materials.

3. Under later questioning, plaintiff responded "yes" when asked whether he would classify the materials he mailed as "possibly being inflammatory or defamatory toward other

NYPD Internal Affairs Bureau launched an investigation in which it sent plaintiff a request for donations from a fictional organization named the "NAACP Legal Defense and Educational Fund." Again, plaintiff returned the reply-envelope with anti-semitic and anti-black literature. Plaintiff admitted to having engaged in approximately 200 such mailings, over the years, in response to solicitations from other organizations.

Plaintiff's conduct and the ensuing investigation attracted media attention. The New York Times covered the story and Channel 12, Fox 5 news, ABC News on Channel 7, and a local Long Island station carried television coverage.

On March 24, 1998, the NYPD's Internal Affairs Bureau questioned plaintiff about the mailings, their contents, and his political beliefs. He readily admitted his involvement in the mailings, claiming at different points that they were "just a hobby," a protest of the solicitations he had received, and message to the organizations to cease soliciting from him. He maintained, however, and still does, that he did not himself author any of the articles or cartoons mailed.

The New York Police Department charged plaintiff with engaging in prohibited conduct, namely the dissemination of defamatory materials through the mails, in violation of *Patrol Guide* § 104–01, p. 3, ¶ 2(b) ("Prohibited Conduct"). An administrative disciplinary trial was held before Assistant Deputy Commissioner of Trials, Josefina Martinez ("Commissioner Martinez"). At the trial, plaintiff was permitted to testify, call witnesses, introduce exhibits, and to cross-examine any adverse witnesses. He was represented by counsel throughout the proceeding.[4] The NYPD called no witnesses but presented its case through a series of stipulations and exhibits. Plaintiff testified in his own defense and argued, *inter alia,* that his speech was protected by the First Amendment.

Commissioner Martinez rendered her decision on June 25, 1999, finding plaintiff guilty of two counts of prohibited conduct and recommending Pappas' dismissal from the NYPD. In so doing, she considered— and rejected—plaintiff's First Amendment defense, which he now raises as a claim. She found that (1) plaintiff's conduct did not amount to protected speech on a matter of public concern; and alternatively, (2) the potential for disruption in the NYPD outweighed the value of the purported speech.

On August 18, 1999 Commissioner Safir adopted Commissioner Martinez's recommendation and terminated plaintiff's employment.

In January, 2000, without pursuing any further remedies in state court, plaintiff filed this action, claiming that the NYPD's termination of his employment was unlawfully in retaliation for speech protected under the First Amendment. At the time plaintiff filed this action, his time to challenge the administrative decision in state court through an Article 78 Proceeding had expired.

## DISCUSSION

This Court addresses the case on cross-motions for summary judgment. Summary judgment is properly granted " 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to material fact and that the moving party is entitled to judgment as a matter of law.' " *R.B. Ventures, Ltd. v. Shane,* 112 F.3d 54, 57 (2d Cir.1997) (quoting Fed.R.Civ.P. 56(c)).

---

ethnic groups or religious backgrounds or sexual orientation" (March 24, 1998, NYPD Internal Affairs Bureau Interrogation ("IAB") at 15) and "yes," again, when asked whether he "sent out material that could be described as anti-Semitic" (IAB at 23).

**4.** Plaintiff was represented by same counsel as in this action.

The Federal Rules of Civil Procedure mandate the entry of summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

In reviewing the record, we must assess the evidence "in the light most favorable to the non-movant and ... draw all reasonable inferences in his favor." *Delaware & Hudson Ry. Co. v. Consolidated Rail Corp.*, 902 F.2d 174, 177 (2d Cir.1990). The mere existence, however, of an alleged factual dispute between the parties will not defeat a motion for summary judgment. Rather, the non-moving party must affirmatively set forth facts showing that there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). An issue is "genuine ... if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248, 106 S.Ct. 2505 (internal quotation omitted).

### A. *Collateral Estoppel*

Defendants first argue that the doctrine of collateral estoppel bars plaintiff's action. Defendants rely on the administrative, disciplinary trial in which Commissioner Martinez decided on the merits the identical First Amendment issue underlying this action. This argument squarely presents the question of whether federal district courts adjudicating § 1983 actions should give issue preclusion to unreviewed legal determinations by state administrative bodies.

■ Collateral estoppel or "issue preclusion"[5] is the procedural doctrine that "once a court has decided an issue of fact or law necessary to its judgment, that decision may preclude relitigation of the issue in a suit on a different cause of action involving a party to the first case." *Allen v. McCurry*, 449 U.S. 90, 94, 101 S.Ct. 411, 66 L.Ed.2d 308 (1980). Issue preclusion is a tool of judicial efficiency, not substantive review. It "preclude[s] parties from contesting matters that they have had a full and fair opportunity to litigate protects their adversaries from the expense and vexation attending multiple lawsuits, conserves judicial resources, and fosters reliance on judicial action by minimizing the possibility of inconsistent decisions." *Montana v. United States*, 440 U.S. 147, 153–154, 99 S.Ct. 970, 59 L.Ed.2d 210 (1979).

■ In principle, issue preclusion can apply to both findings of fact and determinations of law. In *University of Tennessee v. Elliott*, 478 U.S. 788, 106 S.Ct. 3220, 92 L.Ed.2d 635 (1986), the Supreme Court held, as a matter of federal common law, that "when a state agency 'acting in a judicial capacity ... resolves *disputed issues of fact* properly before it which the parties have had an adequate opportunity to litigate,' ... federal courts must give the agency's factfinding the same preclusive effect to which it would be entitled in the State's courts" (emphasis added). *Elliott* at 798, 106 S.Ct. 3220, *quoting* U.S. v. *Utah Construction & Mining Co.*, 384 U.S. 394, 422, 86 S.Ct. 1545, 16 L.Ed.2d 642 (1966) (internal citations omitted). As the Second Circuit more recently stated, the Supreme Court "expressly found that issue preclusion based on unreviewed state agency [fact] determinations is appropriate in § 1983 civil rights actions." *Doe v. Pfrommer*, 148 F.3d 73, 79 (2d Cir.1998). Thus, assuming Mr. Pappas' disciplinary proceeding comported with the specified issue preclusion requirements under New York law, *see id* (explaining New York's

---

**5.** The Restatement of Judgments now refers to collateral estoppel as "issue preclusion." *See* Restatement (Second) of Judgments § 74 (Tent. draft No. 3, Apr. 15, 1976). This renaming reduced the confusion caused when courts and commentators loosely referred to both claim preclusion (res judicata) and issue preclusion (collateral estoppel) as "res judicata." *Allen*, 449 U.S. at 94, 101 S.Ct. 411.

requirements for issue preclusion), Commissioner Martinez's *findings of fact* are preclusive in this action.

 However, whether unreviewed administrative *determinations of law* are entitled to issue preclusion in a § 1983 action is an issue of first impression in the Second Circuit.[6] *See Doe* 148 F.3d at 80 ("Currently, this circuit has not taken a position regarding the split in the circuits as to whether to give preclusive effect to the unreviewed legal determinations of state administrative decisions.") (internal citations omitted); *DeSario v. Thomas*, 139 F.3d 80, 86 (2d Cir.1998); *Locurto v. Giuliani*, 95 F.Supp.2d 161, 167 (S.D.N.Y. 2000) ("The question in this Circuit [of issue preclusion of unreviewed state administrative determinations of law] is, as yet, undecided.").

The Second Circuit has observed that other Circuits are split on this issue and plaintiff contends that the majority who have considered the question have refused to preclude unreviewed administrative determinations of law. *See DeSario* 139 F.3d at 86 (noting that the Fourth and Eleventh Circuits have not allowed preclusion while the Ninth Circuit has); *Locurto* 95 F.Supp.2d at 167 (reporting that the Third, Fourth, Eighth and Eleventh Circuits have not allowed preclusion, in contrast to the Ninth).

Examining the precedents cited by the plaintiff and referenced in *Doe* and *Locurto*, it is evident that only the Third Circuit has ruled squarely against allowing legal issue preclusion and only the Ninth Circuit

has ruled it is allowable. *Compare Edmundson v. Borough of Kennett Square*, 4 F.3d 186, 192–193 (3rd Cir.1993)("It is the legal issue, the Commission's constitutional ruling, that we think is beyond the scope of the Elliot holding."), *with Eilrich v. Remas*, 839 F.2d 630, 632–33 (9th Cir.1988) (upholding issue preclusion of administrative determination on First Amendment issue in § 1983 action relating to a police officer's dismissal for insubordinate speech). The other authorities did not squarely address the issue. *See Dionne v. Mayor and City Council of Baltimore*, 40 F.3d 677 (4th Cir.1994) (only ruled on claim preclusion); *Gjellum v. City of Birmingham*, 829 F.2d 1056 (11th Cir.1987) (only ruled on claim preclusion); *Peery v. Brakke*, 826 F.2d 740 (8th Cir.1987) (comments on issue preclusion were dicta). Therefore, it appears that no consensus exists among the Circuits on this issue.

Although the immediate issue is procedural, the rights and protections it implicates are fundamental. Section 1983 has stood since the end of the Civil War for the simple proposition that federal courts should stand ready to vindicate federal rights in the face of state violation. In *Patsy v. Board of Regents*, 457 U.S. 496, 504, 102 S.Ct. 2557, 73 L.Ed.2d 172 (1982), the Supreme Court explained that the 1871 Congress, "intended § 1 [precursor to § 1983] to 'throw open the doors of the United States courts' to individuals who were threatened with, or who had suffered, the deprivation of constitutional rights, and to provide these individuals immediate

---

**6.** We surmise that the reason that this issue has not been resolved in the Second Circuit is that virtually all New York administrative decisions that give rise to § 1983 claims are initially contested in Article 78 proceedings. Article 78 proceedings provide New York Supreme Court direct review of administrative determinations. *See* N.Y.C.P.L.R. § 7801. Article 78 decisions, in turn, can be appealed to the Appellate Division and the Court of Appeals. Unlike administrative rulings, these determinations constitute state court judgments and are accorded full issue preclusive effect in § 1983 actions under the Full Faith

& Credit statute. *See* 28 U.S.C. 1738 (1994) ("§ 1738"); *Migra v. Warren City Sch. Dist. Bd. of Educ.*, 465 U.S. 75, 82–83, 104 S.Ct. 892, 79 L.Ed.2d 56 (1984); *Leather v. Eyck*, 180 F.3d 420, 424 (2d Cir.1999) ("In a federal 1983 suit, the same preclusive effect is given to a previous state court proceeding as would be given to that proceeding in the courts of the State in which the judgment was rendered."). In the instant case, plaintiff failed to bring a Article 78 action within the four month statute of limitations, *see* N.Y.C.P.L.R. § 217(1), confronting this court with an unreviewed administrative decision.

access to the federal courts notwithstanding any provision of state law to the contrary" (citation omitted). *See Wyatt v. Cole* 504 U.S. 158, 161, 112 S.Ct. 1827, 118 L.Ed.2d 504 (1992) (O'Connor, J.) ("The purpose of § 1983 is to deter state actors from using the badge of their authority to deprive individuals of their federally guaranteed rights and to provide relief to victims if such deterrence fails"); *Mitchum v. Foster,* 407 U.S. 225, 242, 92 S.Ct. 2151, 32 L.Ed.2d 705 (1972) (*quoting Ex parte Virginia,* 100 U.S. 339, 346, 10 Otto 339, 25 L.Ed. 676 (1900)) ("[t]he very purpose of § 1983 was to interpose the federal courts between the States and the people, as guardians of the people's federal rights— to protect the people from unconstitutional action under color of state law, 'whether that action be executive, legislative, or judicial.' "). In accordance with the wide breadth of § 1983's promise, the Supreme Court has liberally construed its availability, refusing to create common law procedural requirements, such as "exhaustion," that would preclude plaintiffs' access to federal courts. *See Patsy,* 457 U.S. at 503–507, 102 S.Ct. 2557.[7]

Although broad, plaintiffs' right to have their § 1983 claims considered *de novo* in federal court is not absolute. A plaintiff cannot use § 1983 to enjoy the proverbial "second bite at the apple." § 1983 provides for causes of action in both state and federal courts, *see Martinez v. California,* 444 U.S. 277, 283–284, n. 7, 100 S.Ct. 553, 62 L.Ed.2d 481 (1980)(state courts may hear § 1983 actions), but not both because 28 U.S.C. § 1738[8] dictates that federal courts accord state court final judgments the same issue and claim preclusion they would enjoy in the state's courts. *See Allen,* 449 U.S. at 103–04, 101 S.Ct. 411 (state court final judgments are entitled to *issue* preclusion in federal § 1983 actions); *Migra v. Warren City School District Board of Education,* 465 U.S. 75, 81, 104 S.Ct. 892, 79 L.Ed.2d 56 (1984)(state court final judgments are entitled to *claim* preclusion in federal § 1983 actions).

Mr. Pappas' claim is perched precariously on the intersection between these two principles. On the one hand, Mr. Pappas had an opportunity to bring an Article 78 action after the adverse administrative determination and he failed to do so. Had he sought Article 78 review, he would have enjoyed the protections and full attention of the New York Supreme Court, a court that the Supreme Court has ruled is fully competent to adjudicate constitutional issues. *See id.* Mr. Pappas' § 1983 action in the wake of his failure to avail himself of state review appears to be the "second bite at the apple" that Congress and the United States Supreme Court disfavored in *Allen* and *Migra.* On the other hand, Mr. Pappas did not "choose" to bring his First Amendment claim in the state administrative proceeding in any meaningful sense. Faced with losing his job, he was forced to raise his First Amendment issue as a defense in the state administrative proceeding. Section 1983's "non-exhaustion" requirement and Congress' commitment to providing a federal forum for constitutional relief would ring hollow if an individual could be forced to litigate his claim before the very agency (in this case, the police

---

**7.** From the time of § 1983's passage, the Supreme Court has ruled that it must be liberally construed to give effect to its remedial purpose. *See Golden State Transit Corp. v. Los Angeles,* 493 U.S. 103, 105, 110 S.Ct. 444, 107 L.Ed.2d 420, (1989) (The Supreme Court has "repeatedly held that the coverage of [§ 1983] must be broadly construed."); *Dennis v. Higgins,* 498 U.S. 439, 443, 111 S.Ct. 865, 112 L.Ed.2d 969 *citing Monell v. Dept. of Social Services of City of New York,* 436 U.S. 658, 684, 98 S.Ct. 2018, 56 L.Ed.2d 611

(1978) (quoting Rep. Shellabarger, Cong. Globe, 42d Cong., 1st Sess., App. 68 (1871)) ("The legislative history of the section also stresses that as a remedial statute, it should be 'liberally and beneficently construed.' ")

**8.** "[J]udicial proceedings [of any court of any State] shall have the same full faith and credit in every court within the United States and its Territories and Possessions as they have by law or usage in the courts of such State...."

**440**

department) he claims violated his constitutional rights.

We begin with the Supreme Court precedent closest to the instant issue, *McDonald v. City of West Branch*, 466 U.S. 284, 104 S.Ct. 1799, 80 L.Ed.2d 302 (1984). In *McDonald*, a police officer brought a federal § 1983 action alleging violation of, *inter alia*, his First Amendment free speech rights after he was discharged following arbitration. The Sixth Circuit ruled that the state arbitration finding that the officer's discharge did not violate his First Amendment rights precluded the officer from relitigating the issue in federal district court. The Supreme Court reversed, *ruling that the federal common law of preclusion does not apply to an unappealed state arbitration decision in a subsequent federal § 1983 action.* Justice Brennan, writing for the Court, explained,

"Because § 1983 creates a cause of action, there is, of course, no question that Congress intended it to be judicially enforceable ... [a]nd, although arbitration is well suited to resolving contractual disputes ... it cannot provide an adequate substitute for a judicial proceeding in protecting the federal statutory and constitutional rights that § 1983 is designed to safeguard. As a result, according preclusive effect to an arbitration award in a subsequent § 1983 action would undermine that statute's efficacy in protecting federal rights."

*Id.* at 290, 104 S.Ct. 1799. The instant action is quite similar to *McDonald* insofar as parties in both state arbitration and administrative proceedings enjoy limited procedural safeguards, face tribunals capable of fashioning only limited relief, and appear before decisionmakers who may have limited legal training. The same concerns that convinced the Court not to accord state arbitration findings issue preclusion in *McDonald* counsel against allowing preclusion in the instant case.

Further, it is important to recall that issue preclusion for administrative decisions, as for arbitration, is a matter of federal common law, not congressional or constitutional mandate. *See Elliott*, 478 U.S. at 796–799, 106 S.Ct. 3220 (administrative fact preclusion for § 1983 is federal common law), *McDonald*, 466 U.S. at 288, 104 S.Ct. 1799 ("Because federal courts are not required by statute to give res judicata or collateral estoppel effect to an unappealed arbitration award, any rule of preclusion would necessarily be judicially fashioned."). In defining federal courts' latitude to create common law procedural requirements in the name of judicial efficiency, the Supreme Court has relied heavily on congressional intent.

For example, in *Patsy*, the Supreme Court ruled that § 1983's promise to provide individuals a federal opportunity to litigate constitutional claims against States prevailed over the purported advantages of applying a federal common law "exhaustion" requirement. *See Patsy*, 457 U.S. at 503–507, 513–16, 102 S.Ct. 2557; *Nussle v. Willette*, 224 F.3d 95, 98 (2d Cir.2000)(the presumptive rule of non-exhaustion is based in large part on Congress' desire to provide independent federal relief for constitutional violations). Regardless of their position on the exhaustion issue, the Justices agreed that only congressional intent could give the Supreme Court the authority to override § 1983's mandate that the doors to the federal courthouse remain open.[9] *Compare Patsy* 457 U.S. at 513–15,

---

9. This focus on congressional intent is a consistent theme in the Supreme Court's § 1983 jurisprudence. *Patsy* stands in contrast to, but not conflict with, *Allen* where the Court searched for whether there was Congressional intent not to apply preclusion. Justice Stewart, writing for the Court in *Allen*, concluded,

"There is, in short, no reason to believe that Congress intended to provide a person claiming a federal right an unrestricted opportunity to relitigate an issue already decided in state court simply because the issue arose in a state proceeding in which he would rather have not been engaged in at all."

102 S.Ct. 2557 (Marshall, J.)(identifying myriad of potential problems posed by an exhaustion requirement), *with Patsy* 457 U.S. at 516–517, 102 S.Ct. 2557 (O'Connor, J., concurring)("considerations of sound policy suggest that a § 1983 plaintiff should be required to exhaust adequate state administrative remedies before filing his complaint ... [however,] in the absence of additional Congressional legislation, exhaustion of administrative remedies is not required in § 1983 actions."). The prospective benefits that the Court found outweighed by Congress' intent to open federal courts were substantial, including, "lessen[ing] the perceived burden that § 1983 actions impose on federal courts ... further[ing] the goal of comity and improv[ing] federal-state relations ... [and] enabl[ing] the agency, which presumably has expertise in the area at issue, to enlighten the federal court's ultimate decision." *Id.* at 512, 102 S.Ct. 2557. Nevertheless, the Court concluded that "policy considerations alone cannot justify judicially imposed exhaustion unless exhaustion is consistent with Congressional intent." *See Id.* at 513, 102 S.Ct. 2557.

The Second Circuit explained that "[t]his categorical statement that exhaustion is not required, and this expansive view of the federal role in protecting constitutional rights," was based on the Supreme Court's ruling that § 1983 is *supplemental* to state remedies. *DeSario,* 139 F.3d at 86. *See Monroe v. Pape,* 365 U.S. 167, 183, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961) ("The federal remedy of § 1983 is supplementary to the state remedy, and the latter need not be first sought and refused before the federal one is invoked.").

■ The issue of whether to give preclusion to unreviewed administrative determinations of law is governed by the same principle: federal common law procedural hurdles capable of precluding § 1983 actions should not be erected without clear evidence of Congressional intent. The very policy arguments expressly rejected in *Patsy*—judicial economy, federal-state comity, agency expertise—are advanced today in support of issue preclusion for unreviewed administrative determinations of law. In the absence of clear Congressional intent to differentiate between exhaustion and preclusion in § 1983 actions, those policy arguments still fail.

Congress has made no such distinction despite ample opportunity to do so. In just the past few years, it has given serious consideration to numerous amendments affecting the scope of § 1983's application, *see, e.g.,* Private Property Rights Limitation Act of 2000 ("PPRLA"), HR 2372, 106th Cong. (2000), and has enacted constricting legislation such as the Prison Litigation Reform Act of 1995, Pub.L. No. 104–134, § 801 *et seq.,* 110 Stat. 1321 (1996)("PLRA") (creating an administrative exhaustion requirement for prisoners seeking to bring certain § 1983 claims). Congress has used these amendments to make specific exceptions to § 1983's general rules. For example, the PLRA and the proposed PPRLA's created targeted exceptions to *Patsy's* general § 1983's no-exhaustion rule. Throughout these efforts and review, however, Congress has not chosen to permit preclusion. This silence speaks loudly in light of its specific pronouncements on exhaustion.

The Supreme Court's specific language in *Elliott* lends further support to the con-

*Allen* 449 U.S. at 104, 101 S.Ct. 411. In *Allen,* unlike *Patsy,* the Court faced very strong evidence that Congress intended state court judgments to be given issue preclusion in federal § 1983 actions: namely, § 1738, the Full Faith and Credit Statute. In light of Congress' specific admonition that federal courts give state court judgments full faith and credit, the rebuttable assumption became that preclusion should be given to state court judgments. Since the Court did not find evidence that Congress specifically intended § 1983 to be free from § 1738 preclusion, federal common law adopted it. Thus, *Allen* and *Patsy* both support the conclusion that, in the absence of conflicting Congressional intent, § 1983 actions should not be subject to federal common law rules that deny plaintiffs' their opportunity to adjudicate their constitutional claims in federal court.

clusion that it did not wish to extend issue preclusion to unreviewed administrative determinations of law. Throughout *Elliott*, the Court specifically and repeatedly referred to administrative "factfinding" in explaining the scope of its holding. *See Elliott* 478 U.S. at 797–799, 106 S.Ct. 3220; *see also Edmundson*, 4 F.3d at 192 ("Elliot was quite specific, however, in referring consistently throughout the opinion to administrative or agency 'factfinding' "), *Gjellum*, 829 F.2d at 1068 ("the Court in Elliot carefully limited its holding to state agency factfinding."). In contrast, the Court made no reference to "factfinding" in other preclusion opinions such as *Allen*, opting instead for a broader holding in terms of "application of res judicata and collateral estoppel concepts." *Allen* 449 U.S. at 97, 101 S.Ct. 411.

The distinction is sensible. As the Court noted in *McDonald*, an arbitrator "may not . . . have the expertise required to resolve the complex legal questions that arise in § 1983 actions." *McDonald*, 466 U.S. at 290, 104 S.Ct. 1799. Likewise, this is the case with state administrative proceedings. Although often highly competent in their designated area of law, administrative decisionmakers generally have neither the training nor the experience to adjudicate complex federal constitutional issues. Indeed, the Second Circuit has recognized courts' unique abilities to adjudicate First Amendment constitutional issues in *Plano v. Baker*, 504 F.2d 595, 599 (2d Cir.1974), "A second factor leading us to hold that the administrative remedy was inadequate is that the constitutional issues raised by this case, particularly in the First Amendment area, lie within the expertise of courts, not the expertise of administrators."

In contrast, the focused expertise that may handicap administrative decisionmakers in adjudicating constitutional issues outside of their practice likely makes their fact-finding skills in these areas comparable to courts of general jurisdiction. *See, e.g., Plano* 504 F.2d at 599 ("it is no doubt true that the facts as viewed by an administrator's expert eye may provide guidance to a court in reaching constitutional determinations."). Thus, in light of the federal courts' special expertise and responsibility in adjudicating federal constitutional matters, the Supreme Court's distinction between state administrative factfinding and determinations of law in *Elliott* appears both purposeful and practical.

In conclusion, allowing issue preclusion for unreviewed administrative determinations would effectively deny Mr. Pappas his opportunity to have his federal constitutional claims adjudicated in federal court. He did not choose to bring the administrative action; it was brought against him. If he had appealed the adverse decision in an Article 78 proceeding, the New York Supreme Court's ruling would have been entitled to full preclusive effect in Mr. Pappas' § 1983 action pursuant to § 1738 and *Allen*. Therefore, if we were to hold today that the administrative determinations of law were preclusive, we would in essence be compelling Mr. Pappas to litigate his federal constitutional claims before the very agency he contends violated them. This result is contrary to Supreme Court teaching. Anticipating this dilemma in *Felder v. Casey*, 487 U.S. 131, 142, 108 S.Ct. 2302, 101 L.Ed.2d 123 (1988), the Supreme Court ruled that "it [is] plain that Congress never intended that those injured by governmental wrongdoers could be required, as a condition of [§ 1983] recovery, to submit their claims to the government responsible for their injuries." *Felder v. Casey*, 487 U.S. 131, 142; 108 S.Ct. 2302, 101 L.Ed.2d 123 (1988).

Our conclusion that preclusive effect should not be given to legal declarations is supported by the purpose of § 1983, Supreme Court precedent, and lack of evidence of Congressional intent. The Supreme Court has made plain that it will not substantially obstruct access to the federal courts for § 1983 actions by imposing exhaustion or other common law pro-

cedural impediments absent clear Congressional intent. As discussed, despite Congress' focus on § 1983 and its addition of an exhaustion requirement in the context of prisoner litigation, Congress has not chosen to otherwise limit § 1983's general availability, despite calls to do so.

The argument advanced by defendants is contrary to all these considerations and would seriously curtail the § 1983 access to the federal courts bestowed by Congress. As the Court noted in *Patsy*, "The very difficulty of these policy considerations, and Congress' superior institutional competence to pursue this debate, suggest that legislative not judicial solutions are preferable." *Patsy*, 457 U.S. at 515, 102 S.Ct. 2557. Accordingly, we will not apply issue preclusion to Commissioner Martinez's determination that Mr. Pappas' speech was not protected by the First Amendment and we now consider his claim on its merits.

### B. *First Amendment*

Mr. Pappas contends that he should be granted summary judgment because his dismissal violated his First Amendment right to freedom of speech. Defendants claim that Mr. Pappas' speech was not protected in the context of his dismissal and, therefore, there was no constitutional violation for which they could be found liable.

■ The Supreme Court has made clear that a public employee's freedom of speech is circumscribed by the government's legitimate interest in "promoting the efficiency of the public services it performs through its employees." *Pickering v. Board of Education*, 391 U.S. 563, 568, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968); see, *e.g., Rankin v. McPherson*, 483 U.S. 378, 384, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1987); *Connick v. Myers*, 461 U.S. 138, 142, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983). A public employee seeking to recover on the ground that he has been disciplined because of his exercise of his First Amendment rights must initially establish: (1) that his speech may

be "fairly characterized as constituting speech on a matter of public concern," *Connick v. Myers*, 461 U.S. at 146, 103 S.Ct. 1684; see, *e.g., Rankin v. McPherson*, 483 U.S. at 384, 107 S.Ct. 2891; and (2) that the speech was "at least a 'substantial' or 'motivating' factor in the adverse action taken by the employer." *White Plains Towing Corp. v. Patterson*, 991 F.2d 1049, 1058 (2d Cir.1993) (*quoting Mt. Healthy City School District Board of Education v. Doyle*, 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977)). If the employee makes this showing, the burden shifts to the government employer to justify its disciplinary action in light of the presumption that employees' speech on matters of public concern is protected. The government employer can meet its burden in two ways.

■ First, the government will prevail if it can show that it reasonably believed that the speech would potentially disrupt the government's activities and that the potential disruption would outweigh the First Amendment value of that speech. *See Waters v. Churchill*, 511 U.S. 661, 673, 677, 681, 114 S.Ct. 1878, 128 L.Ed.2d 686 (1994) (plurality opinion); *Heil v. Santoro*, 147 F.3d 103, 109 (2d Cir.1998); *Jeffries v. Harleston*, 52 F.3d 9, 13 (2d Cir.1995), *cert. denied*, 516 U.S. 862, 116 S.Ct. 173, 133 L.Ed.2d 114 (1995). Second, if there is evidence that the speech was protected, the government employer can still avoid liability if it can show by preponderance of the evidence that it would have undertaken the same disciplinary action even in the absence of the protected speech. *See, e.g., Mt. Healthy City School District Board of Education v. Doyle*, 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977); *White Plains Towing Corp. v. Patterson*, 991 F.2d at 1059; *see also Lowrance v. Achtyl*, 20 F.3d 529, 535 (2d Cir.1994) ("in cases in which state action is motivated by both proper and improper reasons, the action may be sustained if it would have been taken even in the absence of the improper

reason"). We consider plaintiff's claims in light of these standards.

### 1. Public Concern

■ In order to prevail, Mr. Pappas must first establish that his conduct amounted to speech on a matter of "public concern." "Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record." *Connick*, 461 U.S. at 147–48, 103 S.Ct. 1684. To fall within the realm of the "public concern," an employee's speech must "relat[e] to a[ ] matter of political, social, or other concern to the community." *Connick*, 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708. Consequently, First Amendment protection is unavailable when "a public employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters only of personal interest." *Id.* at 147.

*Connick* made clear that courts must look behind pretextual "public concern" rationales proffered by plaintiffs and attempt to discern whether their conduct, taken as a whole, was actually meant to address matters of public concern or was simply a vehicle for furthering private interests.[10] *See Connick*, 461 U.S. at 146–148, 103 S.Ct. 1684; *See also, e.g., Kokkinis v. Ivkovich*, 185 F.3d 840, 844 (7th Cir.1999) ("speaking up on a topic that may be deemed one of public importance does not automatically mean the employee's statements address a matter of public concern as that term is employed in Connick.") [citation omitted] . . . .Rather, we "must instead delve deeper into the precise content, form, and context of speech that admittedly may be of some interest to the public." (*citing Cliff v. Board of Sch. Comm'rs of City of Indianapolis*, 42 F.3d 403, 410 (7th Cir.1994)). In scrutinizing "public concern" characterizations, courts have weighed plaintiffs' subjective intent to speak on a matter of "public concern" and their decision about whether to use a public forum. *See, e.g., Connick*, 461 U.S. at 146–148, 103 S.Ct. 1684; *Kokkinis v. Ivkovich*, 185 F.3d at 844 (ruling that Court must evaluate the employee's "point" in making the expression to determine whether the expression was of "public concern"); *Morgan v. Ford*, 6 F.3d 750, 754 (11th Cir.1993) (In determining whether speech is of public interest, "A court may consider the employee's attempts to make the concerns public, along with 'the employee's motivation in speaking.' " [citations omitted] ).

Courts have been particularly skeptical in cases where plaintiffs have sought to justify patently hateful and inflammatory speech in terms of "public concern." *See, e.g., Tindle v. Caudell*, 56 F.3d 966 (8th Cir.1995) (police officer's off-duty donning of a "blackface" costume demeaning to blacks not an expression on a matter of public concern), *Lawrenz v. James*, 852 F.Supp. 986, 992 (M.D.Fla.1994) (police officer's off-duty wearing of "white power" T-shirt is a matter private interest, not public concern); *Pruitt v. Howard County Sheriff's Dept.*, 96 Md.App. 60, 623 A.2d 696 (1993) (police officers' parody of Hogan's Heros involving Nazi salutes, clicking heels, and utterances in German was a

---

10. In *Connick,* an assistant district attorney was dismissed for circulating a survey in response to the District Attorney's decision to transfer her. The survey contained "questions pertaining to the confidence and trust that [plaintiff's] coworkers possess[ed] in various supervisors, the level of office morale, and the need for a grievance committee." *Connick,* 461 U.S. at 148, 103 S.Ct. 1684. Although the Court recognized that the general functioning of District Attorneys' offices is a matter of public concern in the broadest sense, it found that the survey questions were, "mere extensions of [the plaintiff's] dispute over her transfer ... [and that] the focus of [plaintiff's] questions [was] not to evaluate the performance of the office, but to gather ammunition for another round of controversy with her superiors." *Id.* Accordingly, the Court ruled that the survey (with the exception of one question relating to political campaigns) did not concern matters of "public interest" and, therefore, could not provide grounds for First Amendment relief.

matter of private amusement, not public concern).

In the present case, the question is whether Mr. Pappas' dispatch of several hundred racist mailings in response to solicitations constituted speech on a matter of public concern. Mr. Pappas argues that his mailings address areas of substantial public concern including "race, taxation, religion and historical events such as the Holocaust," Plaintiff's Brief at 17, and that his involvement in political causes involving these issues demonstrates his "public concern" intent. However, his characterization of the issues is misleading and his means of communication belie his purported aim.

The record makes evident that Mr. Pappas intended to convey no message of "public concern" in his mailings to solicitors, he simply wanted to dissuade charities from soliciting money from him by offending them with racist mailings. In his initial interview with police investigators on March 24, 1998, he suggested that his mailings were simply a "hobby" with no purpose. Transcript of March 24, 1998 interview at 16. Later, at his disciplinary hearing, he described his mailings as a form of "protest" against "being shaken down for money by the so-called charitable organizations," Trial Transcript ("Tr.") at 108–110, and explained that he hoped the mailings would stop the organizations from soliciting him. See Tr. at 108–110, 115–116, 149–150, 152, 157, 159. Although the issues of fraudulent charitable solicitations and nonprofit mismanagement could be of public concern, plaintiff's allegation that his conduct amounted to speech on these issues is implausible. By his own admission, his motive was to have his name removed from the mailing lists of solicitors. Alternatively, the mailings could be considered particularly vulgar manifestation of Mr. Pappas' white supremacist "hobby." Under either characterization, his conduct amounted to private interest dressed in public garb and was entitled to no greater First Amendment protection

than the assistant district attorney's survey in *Connick*.

Furthermore, although speech need not be public to be protected as a matter of "public concern," *see Givhan v. Western Line Consolidated School District*, 439 U.S. 410, 99 S.Ct. 693, 58 L.Ed.2d 619 (1979), Mr. Pappas' choice of forum is relevant. *See Connick*, 461 U.S. at 148, 103 S.Ct. 1684 (emphasizing the fact that plaintiff made no attempt to inform public of survey topic or results in deciding speech was not of "public concern"); *see also Kurtz v. Vickrey*, 855 F.2d 723, 729 (11th Cir.1988) ("Kurtz's profession of public concern loses force when it is considered that he took no affirmative steps ... to inform the public at large about, the problems with which he was so gravely concerned."); *Terrell v. University of Tex. Sys. Police*, 792 F.2d 1360, 1362–63 (5th Cir.1986) (in ruling that holding that notebook contents were not protected speech, court emphasized the fact that appellant "made no effort to communicate the contents of the notebook to the public"). Mr. Pappas made no effort to forward his "protests" to the parties involved in the public debate and who represented the public interest, e.g., the Better Business Bureau, charitable oversight agencies, the IRS, the media, or the public at large. Rather, Mr. Pappas suggests that somehow, by anonymously sending his white supremacist literature to any charity with the misfortune of soliciting a donation from him, he was commenting on perennial matters of public concern such as taxation, political history, race and religion. This claim defies reason and the record. Although the First Amendment's protection does not turn on the effectiveness of a speaker's media strategy, Mr. Pappas' purported strategy for addressing a matter of public concern is so plainly unreasonable, it belies his claim that addressing matters of "public concern" was ever his intention.

Mr. Pappas' anonymous and random mailings were not directed at, and played no part in, the "uninhibited, robust, and

wide-open" debate on public issues that the First Amendment affords its highest protection. *New York Times Co. v. Sullivan,* 376 U.S. 254, 270, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). Accordingly, this Court finds that Mr. Pappas' conduct, to the degree it was expressive, did not bear on a matter "public concern" and, therefore, any disciplinary action taken on its account did not violate Mr. Pappas' First Amendment rights.

## 2. *Pickering Balance Test*

Although our inquiry could end here, we will assume *arguendo* that Mr. Pappas can establish that his conduct amounted to speech of "public concern" and was the basis for his dismissal. Therefore, we next consider whether the police department's interest in maintaining efficiency and collegiality outweighed any First Amendment protection to which Mr Pappas' speech was entitled.

■ The Second Circuit has formulated a three-part test based on *Waters v. Churchill,* 511 U.S. 661, 114 S.Ct. 1878, 128 L.Ed.2d 686, to determine whether an employee's discharge for speech is constitutional:

> "[A] government can fire an employee for speaking on a matter of public concern if: (1) the employer's prediction of disruption is reasonable; (2) the potential disruptiveness is enough to outweigh the value of the speech; and (3) the employer took action against the employee based on this disruption and not in retaliation for the speech."

*Jeffries v. Harleston,* 52 F.3d at 13. It is important to note first that the *Jeffries* test focuses on the *potential* for disruption; the disruption need not occur for the potential to have been reasonably foreseen. *See Jeffries,* 52 F.3d at 13–14; *see also Waters,* 511 U.S. at 673, 114 S.Ct. 1878. The reasonableness of a government employer's determination of potential disruption, in turn, is based upon whether the government employer undertook an investigation with the degree of care of a private sector manager would exercise under similar circumstances. *See Waters,* 511 U.S. at 677–78, 114 S.Ct. 1878 (government employer should proceed with "the care that a reasonable manager would use before making an employment decision—discharge, suspension, reprimand, or whatever else—of the sort involved in the particular case"). In evaluating a prediction's reasonableness, "substantial weight is accorded the government employer's prediction that given speech has the potential for disruptiveness." *Heil v. Santoro,* 147 U.S. F.3d at 109. This deference is particularly strong in environments, like police departments, where "close working relationships are essential to fulfilling public responsibilities." *Connick,* 461 U.S. at 151–52, 103 S.Ct. 1684 (in such situations, "a wide degree of deference to the employer's judgment is appropriate.").

■ Applying the *Jeffries* test, we first must decide whether the police department's conclusion that "[Pappas'] actions as a whole erode public respect for police officers which is fundamental to the functioning of this organization," was reasonable. Commissioner Martinez's opinion at 19. As a procedural matter, Pappas received more due process than is typically afforded defendants in administrative hearings. He was aided by counsel, testified in his own defense, and had the right to call witnesses, cross-examine adverse witnesses, and submit evidence. His hearing lasted a day and resulted in a 190 page transcript, multiple exhibits, and a well-reasoned 20 page opinion by Commissioner Martinez. Certainly, the police department displayed the prudence that a reasonable private employer would have under similar circumstances. Therefore, mindful of *Connick* and *Heil*'s deference to government employers' determinations of potential disruption, it is clear that the police department's prediction that Mr. Pappas' conduct would be disruptive was reasonable.

Next, we must determine whether the potential disruption outweighed the First Amendment value of Mr. Pappas' speech. On one side of the scale, we have Mr. Pappas' admittedly racist mailings. Mr. Pappas' racist tracts, sent randomly and anonymously to whichever organizations chanced to send him a mass-mailing solicitation, are at best entitled to a low level of First Amendment protection on the sliding *Pickering* scale. In applying the *Pickering* test, the Supreme Court has held that First Amendment protection is a matter of degree, not kind. *See, e.g., Connick,* 461 U.S. at 152, 103 S.Ct. 1684 ("a stronger showing [of potential disruption] may be necessary if the employee's speech more substantially involved matters of public concern.").

On the other side of the scale, is the NYPD's concern about the potential disruption of having a known racist police officer on the force and in the media spotlight. The Supreme Court has long recognized that a police department has a substantial interest in developing "discipline, esprit de corps, and uniformity" within its ranks in order to fulfill its vital responsibility. *Kelley v. Johnson,* 425 U.S. 238, 246, 96 S.Ct. 1440, 47 L.Ed.2d 708 (1976). *See also McMullen v. Carson,* 754 F.2d 936, 939–940 (11th Cir.1985); *Kannisto v. City and County of San Francisco,* 541 F.2d 841, 843 (9th Cir.1976); *cf. Janusaitis v. Middlebury Volunteer Fire Department,* 607 F.2d 17, 26 (2d Cir.1979) (fire department, like police department, has greater than normal government interest in maintaining morale and discipline). This substantial interest, in turn, gives police departments wide latitude in regulating the expressive activities of its officers in order "to promote efficiency, foster loyalty and obedience to superior officers, maintain morale, and instill public confidence in the law enforcement institution." *Gasparinetti v. Kerr,* 568 F.2d 311, 315–16 (3rd Cir. 1977); *see Tindle v. Caudell,* 56 F.3d 966 (8th Cir.1995); *Gordon v. Town of Hunter,* 1996 WL 77391, at *13 (N.D.N.Y.1996) ("[A] police department has a more signifi-

cant interest than the typical government employer in regulating the speech activities of its employees in order to promote efficiency, foster loyalty and obedience to superior officers, maintain morale, and instill public confidence.") (*citing Tyler v. City of Mountain Home, Arkansas,* 72 F.3d 568, 570); *cf. Chappell v. Wallace,* 462 U.S. 296, 103 S.Ct. 2362, 76 L.Ed.2d 586 (1983) (judicial review of military decisions is very limited because of the gravity of the military's mission and the importance of discipline and harmony in the ranks to the mission's success).

In the instant case, the police department had good reason to fear disruption in the force and the communities it served in reaction to Mr. Pappas' conduct. In view of the special latitude the Supreme Court has given police departments to discipline employees in light of the their essential mission, New York's recent problems with minority communities based on perceptions of police racism, the media coverage of Mr. Pappas' story, and the relatively low First Amendment value of Mr. Pappas' "public concern" speech, we find that there is no triable issue of fact concerning whether the potential for disruption outweighed the value of Mr. Pappas' speech.

Addressing *Jeffries'* third prong, there is no evidence that the police department dismissed Mr. Pappas for the content of his expression as opposed to the potential for disruption in the aftermath of its discovery. Commissioner Martinez's opinion explicitly stated, "[Mr. Pappas] is not being punished for his thoughts, for we are all entitled to those whatever their content, but rather, for the fact that, in derogation of his responsibilities as a public official, he affirmatively acted on them in a manner that was injurious to this Department's reputation." Commissioner Martinez's opinion at 19. Her opinion and recommendation for dismissal were based on a careful application of the department's *Patrol Guide* § 104–1, p. 3, ¶ 2(b) ("Prohibited Conduct"). She methodically

found that Mr. Pappas' conduct satisfied every element of the rule violation, *see* Commissioner Martinez's opinion at 14–18, and that "there has been a sufficient showing of both actual and potential disruption of the Department's working relationships among its owns work force as well as its ability to function effectively in the multicultural environment of our city." *Id.* at 13. Pursuant to these findings and acting within department guidelines, she found Mr. Pappas guilty on two counts of disseminating defamatory material (14–20) and determined that his violations warranted dismissal. *Id.* at 20. Mr. Pappas has proffered no evidence suggesting that the police department had a hidden motive to punish him for his speech. Therefore, the defendants having demonstrated that there are no triable issues of fact pertaining to the three prongs of the *Jeffries* test, this Court finds that the Department's reasonable concern about potential disruption arising from Mr. Pappas' conduct outweighed any First Amendment protection that conduct enjoyed and, therefore, that defendant's dismissal of Mr. Pappas did not violate Mr. Pappas' First Amendment rights.[11]

### CONCLUSION

Defendants' motion for summary judgment is hereby granted and plaintiff's cross-motion for summary judgment is denied.

**IT IS SO ORDERED.**

---

11. In light of the foregoing conclusions of law, it is unnecessary for this Court to reach the third argument raised by defendants,

---

namely the individual defendants' personal involvement or entitlement to qualified immunity