Eugene W. LEVICH, Plaintiff,

v.

THE LIBERTY CENTRAL SCHOOL DISTRICT, Dr. Brian Howard, Former Superintendent of the Liberty Central School District, Edward Rhine, Interim Superintendent of the Liberty Central School District, Robert L. Chakar, Jr., Principal, Liberty Central High School, and Dr. Phillip Olsen, Willis Olivio, Matthew Frumess, Armand Seibert, Frank DeMayo, Chris Murphy, Charles Barbuti, Joyce Burnett and Robert DeStefano, Members of the Board of Education of the Liberty Central School District, Defendants.

No. 02 CIV. 8929(WCC).

United States District Court, S.D. New York.

Dec. 22, 2004.

See also, 258 F.Supp.2d 339.

Law Offices of Robert N. Isseks, Attorneys for Plaintiff, Middletown, NY, Robert N. Isseks, Esq., Alex Smith, Esq., Of Counsel.

Servino Santangelo & Randazzo LLP, Attorneys for Defendants, White Plains, NY, James A. Randazzo, Esq., Of Counsel.

### OPINION AND ORDER

WILLIAM C. CONNER, Senior District Judge.

Plaintiff Eugene Levich brought this action against defendants Liberty Central School District (the "School District"), a public school district in the State of New York, Dr. Brian F. Howard, former Superintendent of the School District, Edward Rhine, Interim Superintendent of the School District, Robert L. Chakar, Jr., Principal of the Liberty Central High School (the "High School" or "School") and, members of the Board of Education: Dr. Philip Olsen, Willis Olivio, Matthew Frumess, Armand Seibert, Frank De-Mayo, Chris Murphy, Charles Barbuti, Joyce Burnett and Robert DeStephano in their individual and official capacities (collectively the "defendants") under 42 U.S.C. § 1983 alleging deprivation of rights, privi-

leges and immunities secured by the First Amendment of the United States Constitution.[1] Plaintiff seeks compensatory damages from the School District and compensatory and punitive damages from all other defendants.[2] Defendants move for summary judgment pursuant to FED. R. CIV. P. 56 to dismiss plaintiff's Complaint in its entirety. For the reasons set forth herein, the motion is granted.

## BACKGROUND

Unless otherwise noted, the following facts are uncontested. Plaintiff is a tenured secondary school teacher employed by the School District (Defs. Rule 56.1 Stmt. ¶ 1.) and he is certified by the State of New York to teach social studies for grades 7–12. (*Id.*) Plaintiff has taught classes principally in World or Global History at the School District since 1973. (V. Complt. ¶ 11.) Prior to the occurrences at issue in the instant action, plaintiff had not been subject to any disciplinary action and did not receive any indication that he was not performing his duties competently.[3] (Hr'g Officer's Opinion and Award at 24.)

In October 2001, plaintiff created and chaired a committee of the Liberty Faculty Association to assess the competence of the School District's administrators. (Defs. Rule 56.1 Stmt. ¶ 3.) This assessment involved the use of a questionnaire to be answered by the teachers in the School District (the "Faculty Survey"). (*Id.*) Based upon the Faculty Survey, the committee expressed the view that the administrators were "incompetent." (*Id.*) In the spring of 2002, plaintiff appeared before the School District's Board of Education (the "Board of Education") at two of its public meetings and allegedly spoke critically of the School District's administration. (*Id.* ¶ 4.)

At the end of the 2001–02 school year, a number of teachers in the social studies department resigned and, as a result, the School District needed an 8th grade teacher. (*Id.* ¶ 5.) In the spring of 2002, Chakar changed plaintiff's teaching assignment from 9th and 10th grade Global History to one Global History class and four sections of 8th grade American History. (Defs. Rule 56.1 Stmt. ¶ 7.) Defendants claim that plaintiff was selected for this assignment because, among other reasons, he is certified by the State of New York to teach social studies grades 7–12. (*Id.* ¶¶ 5, 6.) Plaintiff claims that defendants had no legitimate reason to change his teaching assignment. (Pl. Rule 56.1 Stmt. ¶¶ 5, 6.) Plaintiff maintains that, while he is certified by the State of New York to teach social studies grades 7–12, which includes American History, he is inexperienced in that subject area, and there were other members of the social studies department who were available and qualified for the

---

1. Plaintiff has withdrawn a Fourteenth Amendment claim that was raised in the Verified Complaint.

2. This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343.

3. Defendants contend that plaintiff's failure rate was unacceptably high from 1999 to 2002. Specifically, during the 1998–99 school year 31% of plaintiff's students in grade 10 failed, and 40% in grade 9 failed. In the 2000–01 school year, 31% of plaintiff's students in grade 10 failed and in the third quarter of 2001–02 school year, 34% of plain-

tiff's grade 10 students were failing. (Defs. Rule 56.1 Stmt. ¶ 2.) Plaintiff maintains that: (1) prior to September of 2002 there were no concerns voiced regarding his performance as a teacher; (2) many other teachers experienced similar or worse failure rates during this time period; (3) these statistics do not take into account plaintiff's honors or Chinese language classes in which there were no failures; and (4) during this time period the School District was going through changes and difficulties associated with the integration of students pursuant to Special Education and Rehabilitation Act § 504. (Levich Aff. ¶¶ 10–14.)

assignment.[4] (Levich Reply Aff. ¶¶ 7, 16.) On May 30, 2002, plaintiff sent a memorandum to Chakar wherein he expressed dissatisfaction with his assignment and requested an explanation. (Defs. Rule 56.1 Stmt. ¶ 8.) On June 14, 2002, Chakar responded to plaintiff by letter and set forth reasons for implementing the changes. (Id. ¶ 9.)

Plaintiff claims that in response to the change in his teaching assignment two teachers in the social studies department with experience teaching 8th grade volunteered to teach plaintiff's 8th grade American History classes. (Levich Reply Aff. ¶ 5, Ex. Q.) By letter dated July 25, 2002, to Dr. Philip Olsen, the President of the Board of Education, plaintiff again protested the changes in his teaching assignment. (Defs. Rule 56.1 Stmt. ¶ 10.) On August 29, 2002, another member of the High School social studies department resigned, necessitating, according to defendants, a further change in teaching assignments. (Id. ¶ 12.) Thereafter, an 11th grade American History class was added to plaintiff's teaching assignment replacing his Global History class. (Id. ¶ 13.)

On September 4, 2002, plaintiff sent a letter (the "September 4th letter" or "plaintiff's letter") to the parents of his 11th grade American History class wherein he disavowed any knowledge of American History and disclaimed responsibility should any of the students in his American History class fail the course or the Regents exam. (Defs. Rule 56.1 Stmt. ¶ 15.) As a result of plaintiff's letter, many parents became concerned and contacted the High School seeking an explanation. (Id. ¶ 17.)

In response to plaintiff's letter, on September 9, 2002, Howard sent plaintiff a memorandum which reiterated the rea-

sons for plaintiff's reassignment. (Id. ¶ 19.) Howard also directed plaintiff to write a letter to the students and parents of his American History class, no later than September 17, 2002, apologizing for the September 4th letter and confirming his commitment to discharge his teaching responsibilities effectively. (Id.) Howard also warned plaintiff that failure to draft the apology could result in disciplinary action up to and including termination, pursuant to New York Education Law § 3020–a. (Id.) Plaintiff failed to comply with this directive. (Id.) On September 11, 2002, Howard observed plaintiff's 11th grade American History class. (Id. ¶ 20.) The following day, Howard sent plaintiff a memorandum directing him to respond to a number of concerns based on his class observation. (Id. ¶ 21.) On September 17, 2002, plaintiff wrote to Howard protesting Howard's observation of his class, but plaintiff did not apologize as had been previously directed. (Id. ¶ 22.) By memorandum dated September 18, 2002, Howard again directed plaintiff to write a letter of apology for his September 4th letter and gave him until September 20, 2002 to comply. (Id. ¶ 23.) Once again, Howard cautioned plaintiff that failure to comply could result in a § 3020–a disciplinary proceeding. (Id.) Plaintiff did not meet the September 20th deadline and never wrote a letter of apology. (Id. ¶ 24.)

According to plaintiff, in the period of time following the September 4th letter, all of the tenured members of the social studies department signed a letter of protest in support of plaintiff. (Levich Reply Aff. ¶ 7.) On September 18, 2002, Lance Fialkoff, a new member of the social studies department, sent a letter to Howard and Chakar wherein he asked to be reassigned

---

4. Defendants deny plaintiff's claim that he is inexperienced in American History, but offer no evidence, other than plaintiff's social stud-

ies certification, tending to show plaintiff was experienced in that subject.

to teach American History, and suggested that his schedule be replaced with plaintiff's, since they were each interested in teaching classes in the subject area currently assigned to the other. (*Id.* ¶ 8.) Fialkoff explained that when he was hired in August he was told that he would be teaching American History, but that just prior to the school year he was informed that he would instead teach five sections of Global History. (*Id.*)

On September 30, 2002, the School District reinstated plaintiff's original teaching assignment, which meant that plaintiff would assume all of the responsibility for the classes then assigned to Fialkoff and Fialkoff would take over plaintiff's 8th grade American History classes. (Randazzo Aff., Ex. F.) The same day, Howard sent a letter to the parents to advise them of the changes. (*Id.*)

On October 11, 2002, Howard issued a memorandum to plaintiff setting forth an "improvement plan," which required plaintiff to submit lesson plans and other additional information on student performance. (V. Complt.¶ 33, Ex. L.) Howard cited plaintiff's recent failure rates and certain statements in plaintiff's September 4th letter as reasons for the improvement plan. (*Id.*)

On October 16, 2002, the School District advised plaintiff that the Board of Education found probable cause to bring a disciplinary proceeding against him under § 3020–a for his failure to write a letter of apology as directed by Howard. Plaintiff was charged with two counts of insubordination. (Defs. Rule 56.1 Stmt. ¶ 25.) Shortly thereafter, plaintiff requested a hearing on the matter. (*Id.* ¶ 26.)

On November 8, 2002, plaintiff filed his Complaint in the instant action and sought an Order to Show Cause why a preliminary injunction should not issue pursuant to FED. R. CIV. P. 65(a) enjoining defendants from continuing their pending § 3020–a disciplinary proceeding until a hearing and determination on the merits of this action. *See Levich v. Liberty Cent. Sch. Dist.,* 258 F.Supp.2d 339 (S.D.N.Y. 2003) (Conner, J.). This Court denied the preliminary injunction by Order, dated April 23, 2003. *Id.* Plaintiff's § 3020–a hearing was held on October 17, 2003, and the hearing officer issued an Opinion and Award on May 5, 2004. The hearing officer found plaintiff guilty of each charge of insubordination and imposed a $1,000.00 fine.[5] (Defs. Rule 56.1 Stmt. ¶ 27; Hr'g Officer's Opinion and Award at 24.) Plaintiff did not challenge or appeal the hearing officer's Opinion and Award. (Defs. Rule 56.1 Stmt. ¶ 30; Pl. Rule 56.1 Stmt. ¶ 30.)

During the § 3020–a hearing, plaintiff argued that he could not be found guilty of insubordination because his September 4th letter is protected speech under the First Amendment. (Defs. Rule 56.1 Stmt. ¶ 28; Pl. Rule 56.1 Stmt. ¶ 28.) Plaintiff maintained that the School District brought the disciplinary proceeding to retaliate against him for his participation in developing the Faculty Survey and for comments he made at Board of Education meetings. (*Id.*) The hearing officer determined that plaintiff's September 4th letter was not speech protected by the First Amendment and, even if it were, the School District's need to run the School efficiently and without disruption was a sufficiently compelling reason for infringement of plaintiff's First Amendment rights. (Hr'g Officer's Opin-

---

5. The hearing officer declined to terminate plaintiff, and noted that while plaintiff's actions were a breach of his professional responsibilities and amounted to insubordination, plaintiff served the School District for thirty years free from disciplinary action and there was no indication that, in spite of his letter, he did not perform his assignment competently. (Hr'g Officer's Opinion and Award at 24.)

ion and Award at 19.) The hearing officer found no credible evidence of a nexus between plaintiff's participation in the Faculty Survey, his comments at the Board of Education meetings and the § 3020–a charges. (*Id.* at 22–23.) Defendants' motion for summary judgment followed. Defendants argue that: (1) plaintiff's claims are barred by the doctrine of collateral estoppel; (2) defendants did not violate plaintiff's First Amendment rights; and (3) defendants are entitled to the defense of qualified immunity. (Defs. Mem. Supp. Sum. J. at 8, 10, 17.)

## DISCUSSION

### I. *Standard of Review*

Under FED. R. CIV. P. 56, summary judgment may be granted where there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law. *See* FED. R. CIV. P. 56(c). The burden rests on the movant to demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A genuine factual issue exists if there is sufficient evidence favoring the nonmovant for a reasonable jury to return a verdict in his favor. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In deciding whether summary judgment is appropriate, the court resolves all ambiguities and draws all permissible factual inferences against the movant. *See id.* at 255, 106 S.Ct. 2505. To defeat summary judgment, the nonmovant must go beyond the pleadings and "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574,

586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The court's role at this stage of the litigation is not to decide issues of material fact, but to discern whether any exist. *See Gallo v. Prudential Residential Servs., L.P.,* 22 F.3d 1219, 1224 (2d Cir.1994).

### II. *Collateral Estoppel*

■ Defendants argue that plaintiff's claims are barred by the doctrine of collateral estoppel.[6] Collateral estoppel, or "issue preclusion," is a procedural doctrine and a tool of judicial, not substantive, review. Under New York law, collateral estoppel "precludes a party from relitigating in a subsequent action or proceeding an issue clearly raised in a prior action or proceeding and decided against that party ... whether or not the tribunals or causes of action are the same." *Ryan v. N.Y. Tel. Co.,* 62 N.Y.2d 494, 478 N.Y.S.2d 823, 826, 467 N.E.2d 487 (1984). Collateral estoppel applies only if "(1) the issue in question was actually and necessarily decided in a prior proceeding, and (2) the party against whom the doctrine is asserted had a full and fair opportunity to litigate the issue in the first proceeding." *Colon v. Coughlin,* 58 F.3d 865, 869 n. 2 (2d Cir.1995). The party asserting preclusion carries the burden of establishing that the issue was actually raised and necessarily decided but, once that burden is met, the party opposing preclusion must demonstrate a lack of a full and fair opportunity to litigate. *See id.* at 869.

■ Defendants' argue that the issue of whether the September 4th letter is protected speech, which is currently before this Court, was also before the hearing officer because it was the crux of plaintiff's

---

6. Collateral estoppel is not applicable to plaintiff's claim that the change in the conditions of his employment were made in retaliation for his criticism of the School District's administration as that issue was not raised in the prior § 3020–a proceeding. Defendants had initially argued that collateral estoppel should apply to all of plaintiff's claims, but have since conceded on this point. (Defs. Reply Mem. Supp. Summ. J. at 6.)

defense in the § 3020–a hearing. (Defs. Mem. Supp. Summ. J. at 8.) Plaintiff argues that the issues are not identical and preclusion should not apply because the hearing officer made no determination as to whether plaintiff's refusal to write the letter of apology was protected speech. (Pl. Mem. Opp. Summ. J. at 33.) Plaintiff reasons that because he argued that the September 4th letter was protected speech, but not that his refusal to apologize for the letter was protected speech, he avoids preclusion on this issue. We are not convinced. Plaintiff's argument must fail because it would allow a party to avoid collateral estoppel in a subsequent action merely by changing the statements (or lack thereof) to be considered, even though the statements involve the same factual circumstances and the legal standard requires an overall examination of those circumstances. It is clear that implicit in plaintiff's argument that he can not be disciplined for failing to apologize for the letter because the letter is protected speech, is the assertion that plaintiff's refusal to apologize for the letter is also protected speech.

Plaintiff also claims that because the hearing officer prevented him from fully addressing the reasons behind defendants' decision to change his teaching assignment, plaintiff did not receive a full and fair opportunity to litigate the issues: (1) whether the September 4th letter is protected speech; and (2) whether the § 3020–a charges were in retaliation for plaintiff's participation in the Faculty Survey and his public criticism of the School District's administration. (Pl. Mem. Opp. Summ. J. at 34–35.)

Plaintiff argues that whether defendants had a legitimate reason to change his assignment bears directly on whether the September 4th letter involved a matter of public concern, and also whether defendants retaliated against plaintiff when they

changed his assignment. (*Id.*) Plaintiff asserts that this chain of thought could lead to the conclusion that the § 3020–a charges were a continuation of that retaliation. (*Id.*) In response, defendants argue that plaintiff did have a full and fair opportunity to litigate these issues because plaintiff was present personally and by counsel at the hearing, presented legal and factual arguments in support of his position, presented testimony and cross-examined all witnesses with respect to the issues. (Defs. Mem. Supp. Summ. J. at 9.) Defendants also maintain that the issue of whether plaintiff's letter was protected speech was litigated and decided because plaintiff raised it as a defense and the hearing officer found no evidence of retaliation. (*Id.*)

■ A determination as to whether a prior action or proceeding provided a full and fair opportunity to litigate an issue requires consideration of the "realities of the prior litigation, including the context and other circumstances which may have had the practical effect of discouraging or deterring a party from fully litigating the determination which is now asserted against him." *Ryan*, 62 N.Y.2d at 501, 478 N.Y.S.2d 823, 467 N.E.2d 487 (citing *People v. Plevy*, 52 N.Y.2d 58, 65, 436 N.Y.S.2d 224, 417 N.E.2d 518 (1980)) (internal quotations omitted). The specific factors to be considered include: the nature of the forum and the importance of the claim in the prior proceeding; the incentive and initiative to litigate and the actual extent of litigation; the competence and expertise of counsel; the availability of new evidence; the differences in the applicable law; and the foreseeability of future litigation. *Id.* However, collateral estoppel is a flexible doctrine which can not be mechanically applied or reduced to a rigid formula. *Gilberg v. Barbieri*, 53 N.Y.2d 285, 292, 441 N.Y.S.2d 49, 51, 423 N.E.2d

807, 809 (1981). Applying these principles to this case demonstrates clearly that plaintiff did have a full and fair opportunity to litigate these issues in the § 3020–a hearing.

█ Plaintiff had a right to appear personally and testify on his own behalf, to be represented by counsel, to make arguments, to call witnesses and cross-examine opposing witnesses.[7] Additionally, a pre-hearing conference was held and all testimony at the hearing was taken under oath and preserved on the record. N.Y.C.L.S. Educ. § 3020–a(3). Plaintiff's claim that his speech was protected was important to the hearing because plaintiff raised it as a principal defense. If the hearing officer had determined that plaintiff's speech was protected, it would have been an absolute defense to the disciplinary charges.

Although plaintiff did not choose to bring this First Amendment claim in an administrative forum, he was faced with the possibility of losing his job and therefore had a strong incentive to litigate the issue as thoroughly as possible. Moreover, the record indicates that plaintiff was permitted to present testimony regarding the reasons behind his change of assignment, and also had an opportunity to explain why that issue was relevant at the hearing.[8] (Hr'g Tr. at 53–93.) The hearing officer conducted the same balancing test which would be applied to plaintiff's claims in a § 1983 action and found that even if the September 4th letter was protected, the School District's interest in

running the School efficiently and without disruption outweighed plaintiff's interest in expression on matters of public concern. *See Pickering v. Bd. of Educ.*, 391 U.S. 563, 566, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968). Simply because plaintiff is unhappy with the hearing officer's evidentiary ruling does not mean that plaintiff did not have a full and fair opportunity to litigate the issue and does not entitle him to a second chance for a more favorable outcome in another forum. Additionally, plaintiff failed to take advantage of his opportunity to appeal the hearing officer's decision in New York State Supreme Court, N.Y.C.L.S. Educ. § 3020–a(5), and was obviously satisfied with his counsel's expertise and performance during the § 3020–a hearing as he chose the same individual to represent him in this action. Moreover, the availability of new evidence is not a relevant inquiry because the § 3020–a hearing took place after plaintiff filed his Complaint in this action.

█ This is exactly the type of scenario that the doctrine of collateral estoppel was designed to prevent: the proverbial second bite at the apple. Accordingly, because we find that the § 3020–a hearing afforded plaintiff a full and fair opportunity to litigate the issues of whether the September 4th letter is protected and whether the disciplinary charges were in retaliation for his public speech prior to the letter, it follows that any related issues of fact resolved by the hearing officer are precluded in this action. However, what remains

---

7. Plaintiff called Shawn Lopez and Michelle Quick, teachers in the School District and members of the Liberty Faculty Association, and Howard as witnesses in the § 3020–a hearing. (Hr'g Tr. at 38, 106, 115.)

8. After defendants' counsel raised an objection to plaintiff's line of questioning plaintiff was permitted to explain, in detail, why defendants' reason for plaintiff's reassignment was relevant to the disciplinary hearing.

(Hr'g Tr. at 53–55.) Thereafter, the hearing officer overruled defendants' objection and stated that plaintiff had a right to try and establish that the directive to write the letter of apology was a form of retaliation for "some action by [plaintiff] that was protected in some way." (*Id.* at 60.) After a fairly detailed inquiry into the circumstances surrounding plaintiff's assignment change, defendants renewed their relevance objection and the hearing officer agreed.

less clear is whether the legal determinations are similarly precluded.

 Plaintiff argues that the hearing officer's conclusions regarding the September 4th letter are unreviewed administrative determinations of law and therefore not entitled to preclusive effect in this action. (Pl. Mem. Opp. Summ. J. at 32.) Defendants contend that because plaintiff failed to avail himself of the appeals process he may not now avoid the preclusive use of the hearing officer's determinations of law on the basis that they were unreviewed. (Defs. Reply Mem. Supp. Summ. J. at 6.)

In support of his position plaintiff cites *Univ. of Tenn. v. Elliott*, wherein the Supreme Court discussed whether issue preclusion is applicable to unreviewed state agency determinations in § 1983 civil rights actions. 478 U.S. 788, 106 S.Ct. 3220, 92 L.Ed.2d 635 (1986). In *Elliott* the Supreme Court stated that "when a state agency acting in a judicial capacity ... resolves disputed *issues of fact* properly before it which the parties have had an adequate opportunity to litigate ..., federal courts must give the agency's *factfinding* the same preclusive effect to which it would be entitled in the State's courts." *Id.* at 798, 106 S.Ct. 3220 (quoting *United States v. Utah Constr. & Mining Co.*, 384 U.S. 394, 422, 86 S.Ct. 1545, 16 L.Ed.2d 642 (1966)) (internal citations omitted) (emphasis added). However, the Supreme Court's specific reference to disputed issues of fact and the absence of any reference to disputed issues of law, has led to a lack of consensus among the Circuits on the issue of whether federal district courts adjudicating § 1983 actions should apply collateral estoppel to unreviewed legal determinations by state administrative bodies. *Id.* The Second Circuit has not yet taken a position; thus, here the issue remains one of first impression. *See Doe v. Pfrommer*, 148 F.3d 73, 79 (2d Cir.1998).

A review of relevant case law reveals two Circuits in particular that stand out as having taken firm positions on the issue of whether federal district courts adjudicating § 1983 actions should apply issue preclusion to unreviewed legal determinations by state administrative bodies. *See Pappas v. Giuliani*, 118 F.Supp.2d 433, 438 (S.D.N.Y.2000). For instance, the Ninth Circuit in *Eilrich v. Remas*, which involved a § 1983 action relating to a police officer's dismissal for insubordinate speech, dismissed plaintiff's argument that *Elliott* applies preclusive effect only to administrative determinations of disputed facts. *Eilrich v. Remas*, 839 F.2d 630, 634 n. 2 (9th Cir.1988). The court reasoned that *Elliott* "does not articulate a distinction between issues of fact and law in applying preclusion to administrative proceedings." However, in doing so the court fails to address the Supreme Court's use of the word "factfinding." *Id.* Conversely, the Third Circuit in *Edmundson v. Borough of Kennett Square*, a case which also involved a § 1983 action relating to a police officer's discharge for public criticism of his superior officer, the court determined that issue preclusion should not apply to an administrative agency's unreviewed constitutional ruling. 4 F.3d 186, 192 (3d Cir.1993). *Edmundson* opined that unreviewed determinations of law could not properly be given preclusive effect under *Elliott* because of the Supreme Court's very specific use of the word "factfinding" throughout the opinion, especially when compared with the language used in other opinions involving administrative estoppel. *Id.* (comparing *Elliott*, 478 U.S. at 798, 106 S.Ct. 3220 with *Astoria Fed. Sav. & Loan Ass'n v. Solimino*, 501 U.S. 104, 111 S.Ct. 2166, 115 L.Ed.2d 96 (1991)); *see also Allen v. McCurry*, 449 U.S. 90, 97, 101 S.Ct. 411, 66 L.Ed.2d 308 (1980).

Consequently, in view of *Elliott's* consistent choice of language, we find defen-

dants' reliance on *Eilrich* misplaced, and unlike the Ninth Circuit, we are not persuaded by the fact that *Elliott* did not articulate a distinction between issues of fact and law. *Elliott*, 478 U.S. at 799, 106 S.Ct. 3220. Instead, like the Third Circuit we conclude that the Court did draw a distinction with its deliberate choice of language. We do not believe the Court's consistent reference to factfinding was inadvertent; the distinction between issues of fact and law can be found in what the Court did and did not say. Further, we do not find merit in defendants' argument that plaintiff's failure to appeal in state court prevents him from avoiding the preclusive use of the hearing officer's conclusions of law in this action. In *Eilrich*, the court applied an exhaustion of remedies principle to the plaintiff's argument that administrative decisions in general are not preclusive if unreviewed; however, not only is that is not the issue currently before us, but *Elliott* has already eliminated any confusion regarding the application of collateral estoppel to unreviewed administrative findings. *See Eilrich*, 839 F.2d at 632–33 (citing *Plaine v. McCabe*, 797 F.2d 713 (9th Cir.1986)). *Eilrich* does not go so far as to discuss exhaustion in response to plaintiff's argument that *Elliott* applies only to issues of fact. *Id.* In truth, the Second Circuit cases cited by defendants in support of their argument are not factually or legally relevant to this action.[9] Those cases stress the important role that appellate review plays in assuring the accuracy of decisions, but also state that failure to appeal (as compared to the inability to obtain review or the lack of review once an appeal is made) does not prevent preclusion. Neither case goes as far as to state that failure to appeal mandates preclusion. *See Doe*, 148 F.3d at 79 (stating that *Elliott* "expressly found that issue preclusion based on unreviewed state agency [factual] determinations is appropriate in § 1983 civil rights actions.").

This Court agrees with the reasoning expressed by the Third Circuit in *Edmundson* and two district court cases cited by plaintiff, *Pappas v. Giuliani* and *Locurto v. Giuliani*, in which those courts declined to extend preclusive effect to unreviewed agency determinations of law. *See Edmundson*, 4 F.3d at 192; *see also Pappas*, 118 F.Supp.2d at 442 (choosing not to apply issue preclusion to unreviewed administrative decisions in finding that plaintiff police officer's distribution of political and allegedly defamatory materials was not protected by the First Amendment regardless of plaintiff's failure to appeal in state court); *Locurto v. Giuliani*, 269 F.Supp.2d 368, 381 n. 7 (S.D.N.Y.2003) (citing *Pappas* and noting that in its subsequent opinion in *Pappas v. Giuliani*, 290 F.3d 143, 145 n. 1 (2d Cir.2002), the Second Circuit chose not to address directly the accuracy of the district court's conclusion and instead went on to consider the merits of plaintiff's First Amendment claim on the assumption that plaintiff's § 1983 action was not barred by collateral estoppel).

As mentioned above, we find the Supreme Court's choice of language in *Elliott* too specific and consistent to ignore. It should not be assumed that the Supreme Court uses words casually. Further, this interpretation of *Elliott* comports with the

---

**9.** Defendants cite *Johnson v. Watkins*, 101 F.3d 792 (2d Cir.1996) (discussing collateral estoppel in the acquittal context under New York law) and *Gelb v. Royal Globe Ins. Co.*, 798 F.2d 38 (2d Cir.1986) (finding plaintiff insured did not receive effective appellate review). We note that both *Johnson* and *Gelb* were decided prior to the Second Circuit's decision in *Doe. See Doe*, 148 F.3d at 79 (recognizing that the issue of whether collateral estoppel should apply to unreviewed legal determinations by state administrative bodies remains one of first impression in the Second Circuit).

fundamental purpose of § 1983 to "interpose the federal courts between the States and the people, as guardians" of their constitutional rights. *See Pappas*, 118 F.Supp.2d at 439 (citing *Mitchum v. Foster*, 407 U.S. 225, 242, 92 S.Ct. 2151, 32 L.Ed.2d 705 (1972) (*quoting Ex parte Virginia*, 100 U.S. 339, 346, 25 L.Ed. 676 (1900)) (internal quotations omitted)). In view of this remedial purpose, the Supreme Court has consistently ruled that § 1983 must be liberally construed. *Id.* at n. 7 (citing *Golden State Transit Corp. v. Los Angeles*, 493 U.S. 103, 105, 110 S.Ct. 444, 107 L.Ed.2d 420 (1989)). Therefore, federal common law procedural requirements, such as an exhaustion requirement, should not be applied absent clear Congressional intent.[10] *Patsy v. Bd. of Regents*, 457 U.S. 496, 503–07, 102 S.Ct. 2557, 73 L.Ed.2d 172 (1982).

Congress has chosen to limit the scope of § 1983 in other specific situations, but has remained silent on the matter of preclusion generally. *See, e.g.,* The Prison Litigation Reform Act of 1995, 18 U.S.C. § 3601 (creating an administrative exhaustion requirement for prisoners seeking to bring certain § 1983 claims); *see also Pappas*, 118 F.Supp.2d at 441. We conclude that if Congress intended § 1983's application to be limited by an exhaustion of remedies requirement, it would have explicitly done so.

*Elliott*'s distinction between issues of fact and law also makes sense in light of the court's unique expertise and ability to adjudicate First Amendment constitutional issues. *Pappas*, 118 F.Supp.2d at 442 (citing *Plano v. Baker*, 504 F.2d 595, 599 (2d Cir.1974) and noting that the Second Circuit has recognized that the expertise re-

quired for First Amendment issues lies with the courts and not administrators); *see also Edmundson,* 4 F.3d at 193 ("we do not think that an administrative agency consisting of lay persons has the expertise to issue binding pronouncements in the area of federal constitutional law."). While we recognize that the hearing officer presiding over plaintiff's § 3020–a hearing was an attorney, we do not believe that he or any administrative officer has the background or experience necessary to make final decisions in First Amendment cases which pose difficulties even for federal courts experienced in that area of the law. *McDonald,* 466 U.S. at 290, 104 S.Ct. 1799 (ruling that a state arbitration proceeding is not an "adequate substitute for a judicial proceeding in protecting the federal statutory and constitutional rights that § 1983 is designed to safeguard" and stating that "an arbitrator's expertise pertains primarily to the law of the shop, not the law of the land") (citing *Alexander v. Gardner–Denver Co.,* 415 U.S. 36, 57, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974), *rev'd on other grounds,* 473 U.S. 614, 105 S.Ct. 3346, 87 L.Ed.2d 444 (1985)) (internal quotations omitted).

We also note that plaintiff did not choose to bring his First Amendment claims in an administrative context. In fact, plaintiff sought a preliminary injunction delaying the § 3020–a hearing until after his claims were heard by this Court. However, faced with the prospect of losing his tenured position, he had no choice but to raise his First Amendment issue as a defense in the § 3020–a hearing. The remedial purpose of § 1983 and Congress' commitment to providing a federal forum for constitutional relief would certainly be

---

**10.** The Supreme Court in *McDonald v. City of West Branch* has explained that "[b]ecause federal courts are not required by statute to give *res judicata* or collateral estoppel effect to an unappealed arbitration award, any rule

of preclusion would necessarily be judicially fashioned." 466 U.S. 284, 288, 104 S.Ct. 1799, 80 L.Ed.2d 302 (1984), *rev'd on other grounds,* 473 U.S. 614, 105 S.Ct. 3346, 87 L.Ed.2d 444 (1985).

undermined "if an individual could be forced to litigate his claim before the very agency he claims violated his constitutional rights." *Pappas*, 118 F.Supp.2d 433 at 439–40, 442 (citing *Felder v. Casey*, 487 U.S. 131, 142, 108 S.Ct. 2302, 101 L.Ed.2d 123 (1988) ("it [is] plain that Congress never intended that those injured by governmental wrongdoers could be required, as a condition of [§ 1983] recovery, to submit their claims to the government responsible for their injuries.")). Accordingly, we will not apply issue preclusion to the hearing officer's determination that plaintiff's September 4th letter was not protected by the First Amendment and will now consider the merits of plaintiff's retaliation claims.

### III. *First Amendment Retaliation*

Plaintiff asserts two separate First Amendment retaliation claims, one arising from the changes in plaintiff's conditions of employment and the other arising from the § 3020–a disciplinary charges.

■■ In order to state a claim under § 1983 for retaliation in violation of the First Amendment "a plaintiff must demonstrate that: (1) his or her speech was constitutionally protected; (2) he or she suffered an adverse employment action; and (3) a causal connection exists between the speech and the adverse employment action so that it can be said that the speech was the motivating factor in the determination." *Washington v. County of Rockland*, 373 F.3d 310, 320 (2d Cir.2004). If the plaintiff satisfies the burden of showing that an improper motive played a substantial role in defendant's action, then defendant may either: (1) show that it would have taken exactly the same action absent the improper motive; or (2) show that plaintiff's speech was likely to disrupt the government's activities and that the likely disruption is sufficient to outweigh the value of plaintiff's First Amendment

expression. *Scott v. Coughlin*, 344 F.3d 282, 287–88 (2d Cir.2003); *Cobb v. Pozzi*, 352 F.3d 79, 92 (2d Cir.2003). The latter option is commonly known as "the Pickering balance test" and is a matter of law for the court to decide. *See Pickering*, 391 U.S. at 568, 88 S.Ct. 1731; *see also Cobb*, 352 F.3d at 92 (citing *Locurto v. Safir*, 264 F.3d 154, 166 (2d. Cir.2001)).

### A. *Conditions of Plaintiff's Employment*

■ Plaintiff first alleges that he suffered adverse changes in the conditions of his employment as a result of defendants' decisions to: (1) change his teaching assignment from Global to American History; (2) excessively monitor his classes; (3) give him his first negative evaluation; and (4) impose an improvement plan consisting of unnecessary "busy work." (V. Complt. ¶¶ 22, 25, 27, 33–34.) Plaintiff claims that these changes were in retaliation for his First Amendment protected speech, both in conducting the Faculty Survey and in speaking critically of the administration before the Board of Education. (Pl. Mem. Opp. Summ. J. at 23.)

Defendants do not dispute that plaintiff's conduct, either in conducting the Faculty Survey or publicly criticizing the School District's administration, has satisfied the first element of engaging in speech that is protected by the First Amendment. However, defendants argue that plaintiff has not suffered any adverse employment action. (Defs. Reply Mem. Supp. Summ. J. at 3–4.) Specifically, defendants contend that the changes mentioned by plaintiff constitute *de minimus* adverse action, none of which rises to the level of a constitutional violation, because: (1) plaintiff was switched back to his original teaching assignment within the first month of the school year; (2) plaintiff suffered no loss of income as a result of the

switch in assignments; and (3) plaintiff pursued every remedy available to him as a teacher in contesting the change in his assignment, including having his union file a grievance and an improper practice charge and his filing of a petition with the Board of Education. (*Id.* at 3 (citing Hr'g Tr. at 56–57).) Plaintiff does not address this argument in his opposition.

"A plaintiff sustains an adverse employment action if he endures a 'materially adverse change' in the terms and conditions of employment." *Galabya v. New York City Bd. of Educ.*, 202 F.3d 636, 640 (2d Cir.2000) (citing *Richardson v. N.Y. State Dep't of Corr. Serv.*, 180 F.3d 426, 446 (2d Cir.1999)). In order to be "materially adverse" a change must be "more disruptive than a mere inconvenience or an alteration of job responsibilities." *Galabya*, 202 F.3d at 640 (quoting *Crady v. Liberty Nat'l Bank and Trust Co.*, 993 F.2d 132, 136 (7th Cir.1993)). Examples of a materially adverse change include, but are not limited to "a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices ... unique to a particular situation." *Id.*

We do not believe that the changes in plaintiff's conditions of employment constitute adverse employment action sufficient to state a *prima facie* case for retaliation under § 1983. A mere change in duties from one set of classes to another is not a materially adverse change in employment. *See Carlucci v. Kalsched*, 78 F.Supp.2d 246, 255 (S.D.N.Y.2000) (finding that plaintiff's increase or change in job responsibilities as a nurse did not affect her employment in a way that was both detrimental and substantial) (citing *Boylan v. Arruda*, 42 F.Supp.2d 352, 354 (S.D.N.Y.1999)). At most, the evidence submitted by plaintiff indicates that he was required to re-familiarize himself with course material on American History; however, he was given the entire summer to do so. Additionally, the curriculum for which plaintiff is certified includes American History. While an unexpected need to prepare more than usual for the upcoming school year could be seen as an unpleasant inconvenience, it is certainly not materially adverse. Moreover, as plaintiff himself points out, within a few weeks of the start of school year plaintiff was restored to his original assignment of teaching Global History. (Pl. Mem. Opp. Summ. J. at 12, 23.)

Plaintiff has also failed to show how the negative evaluation, monitoring of his classroom or improvement plan has effected his employment in a detrimental and substantial way. *See Carlucci*, 78 F.Supp.2d at 255. Regarding the evaluation, plaintiff has not shown anything other than the existence of Howard's memorandum. *See Sanders v. New York City Human Res. Admin.*, 361 F.3d 749, 756 (2d Cir.2004) (citing *Weeks v. New York State (Div. of Parole)*, 273 F.3d 76, 86 (2d Cir. 2001) (holding that a notice of discipline and a counseling memo by themselves were insufficient, as a matter of law, to constitute adverse employment action), abrogated on other grounds by *National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 108–14, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002)). While it is true that no individual enjoys receiving negative feedback, criticism of an employee is necessary to allow employees to develop, improve and avoid discipline, and is not in and of itself an adverse employment action. *Weeks*, 273 F.3d at 86 (citing *Smart v. Ball State Univ.*, 89 F.3d 437, 442–43 (7th Cir.1996)).

In addition, plaintiff has not shown that defendants' monitoring of his classes or the improvement plan was excessive, a deliberate harassment or anything more serious than an embarrassing

implied criticism. A combination of "seemingly minor incidents [can] form the basis of a constitutional retaliation claim once they reach a critical mass." *Phillips v. Bowen*, 278 F.3d 103, 109 (2d Cir.2002). However, "plaintiff must demonstrate that the actions allegedly taken by defendants created a working environment unreasonably inferior to what would be considered normal for that position." *Id.* We do not believe that plaintiff has shown how the "total circumstances of [his] working environment changed to become unreasonably inferior and adverse when compared to a typical or normal, not ideal or model, workplace." *Id.* Thus, because plaintiff has failed to allege that he suffered any adverse employment action, he has failed to state a claim for retaliation under § 1983. Accordingly, defendants' motion for summary judgment as to plaintiff's first retaliation claim is granted.

### B. *The § 3020–a Charges*

 Plaintiff next claims that the § 3020–a charges were intended to punish plaintiff for the September 4th letter, which plaintiff alleges is speech protected by the First Amendment.[11] (V. Complt. ¶ 42.) Defendants' argue that plaintiff's September 4th letter is not protected by the First Amendment because it does not address a matter of public concern and, even if it did, plaintiff's right of expression would be outweighed by the School District's interest in maintaining the effective operation of the School. (Defs. Mem. Supp. Summ. J. at 11–13.)

For speech to be protected under the First Amendment, it must first relate to "any matter of political, social or other

concern to the community." *Connick v. Myers*, 461 U.S. 138, 146, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983). The determination of whether a particular instance of speech relates to a matter of public concern is a question of law for the court, and must be "determined by the content, form, and context of a given statement, as revealed by the whole record." *Id.* at 148, 103 S.Ct. 1684. In making its determination, the court should focus on the motive of the speaker, attempting to discern whether the speech was calculated to redress personal grievances or whether it had a broader public purpose. *See Lewis v. Cowen*, 165 F.3d 154, 163–64 (2d Cir.1999). The key inquiry is whether the statements were made by plaintiff in his role as a disgruntled employee or his role as a concerned citizen. *Id.*

If the speaker is a public employee, the court's task is first to determine whether the speech at issue relates to a matter of public concern. If the speech does relate to a matter of public concern, then the court must balance the employee's First Amendment right to comment upon matters of public concern with the interests of the state, as an employer, in promoting the efficiency of the public services it performs through its employees. *Pickering*, 391 U.S. at 568, 88 S.Ct. 1731; *Connick*, 461 U.S. at 140, 103 S.Ct. 1684 (recognizing that "the State's interests as an employer in regulating the speech of it employees differ significantly from those it possesses in connection with the regulation of the speech" of ordinary citizens). Therefore, when "employee expression cannot be fairly considered as relating to any matter of

---

11. Plaintiff also claims that the § 3020–a charges were intended to punish him for his participation in the Faculty Survey and his public criticism at the Board of Education meetings. However, we need not address that part of plaintiff's claim herein because the hearing officer determined that there was

no credible evidence that the § 3020–a charges were in retaliation for any of plaintiff's actions prior to the September 4th letter, and, as discussed *supra* in Part II., that determination of fact is entitled to preclusive effect. *Elliott*, 478 U.S. at 798, 106 S.Ct. 3220.

political, social or other concern to the community, government officials should enjoy wide latitude in managing their offices," without interference from the judiciary in the name of the First Amendment. *Connick,* 461 U.S. at 146, 103 S.Ct. 1684.

Defendants argue that plaintiff's September 4th letter could not possibly be considered as touching on a matter of public concern because all of the statements in the letter were self-serving and related only to his personal grievances and disputes with the administration over the changes in his teaching assignment. (Defs. Mem. Supp. Summ. J. at 12.) Plaintiff argues that the main point of his letter was to alert the parents about the potential impact on the students' educational welfare, and only indirectly implicated his personal dispute with the School District. (Pl. Mem. Opp. Summ. J. at 27.)

We disagree with plaintiff's argument. Viewed in the context and circumstances under which the speech was made, plaintiff's letter related primarily to his personal situation, and only indirectly, if at all, involved a matter that could possibly be construed as a matter of public concern. *See Ezekwo v. New York City Health & Hosps. Corp.,* 940 F.2d 775, 781 (2d Cir. 1991) ("the mere fact that one or two of plaintiff's statements could be construed broadly to implicate matters of public concern does not alter the general nature of her statements."); *see also Harris v. Beedle,* 845 F.Supp. 1030, 1034 (S.D.N.Y.1994) (holding plaintiff's argument that implicit in her criticism of her public employer's training session was an allegation that it was a waste of taxpayer money "would eradicate *Connick's* distinction between speech touching upon employment issues and speech regarding public matters").

In *Ezekwo,* the plaintiff, a medical doctor, authored a series of verbal complaints, letters and memoranda to the director of the medical residency program. The complaints concerned several areas of personal dissatisfaction including, *inter alia,* the lack of personal attention she received from the attending physicians, the director's poor management and motivational skills, and the poor teaching methods of the attending physicians. The Second Circuit held that plaintiff's complaints "were personal in nature and generally related to her own situation within the ... residency program" and that plaintiff was not on a mission to protect the public welfare, but instead her "primary aim was to protect her own reputation and individual development as a doctor." *Ezekwo,* 940 F.2d at 781.

We find *Ezekwo* instructive and conclude that plaintiff was primarily motivated by a desire to express his own personal frustration and dissatisfaction with the School District's decision to change his teaching assignment upon the belief that his expertise was being underutilized. We find that plaintiff wrote the September 4th letter in his role as a disgruntled employee and not as a private citizen.[12] *Connick,* 461 U.S. at 146, 103 S.Ct. 1684. The letter is phrased in terms of plaintiff's specific situation and his personal complaints. In fact the entire letter is written in the first person. (V. Complt., Ex. C.) Not once does plaintiff expand his focus and mention the broader issues allegedly implicated, although he does include a paragraph detailing his educational background and academic achievements. (*Id.*) The closest plaintiff comes to mentioning his alleged primary concern for the welfare of the students is his final sentence, which reads "[i]f, however, your son or daughter fails

---

**12.** Compare plaintiff's public criticism of the School District's administration at the Board of Education meetings, when plaintiff did speak in his role as a private citizen, and not merely as an employee.

the course or the Regents examination in American History, please do not blame me." (*Id.*) If plaintiff truly had been motivated by a broader public concern, it seems that as someone who has already participated in public criticism of the School District's administration (the Faculty Survey and public comments made at Board of Education meetings), plaintiff would have found a more appropriate and effective way of doing so in this instance. "The First Amendment does not require a public office to be run as a roundtable for employee complaints over internal office affairs." *Ezekwo,* 940 F.2d at 781 (quoting *Connick,* 461 U.S. at 149, 103 S.Ct. 1684) (internal quotations omitted).

 Moreover, even if we were to determine that plaintiff's letter did address a matter of public concern we conclude that plaintiff's First Amendment rights in this context would be outweighed by the School District's interest in running the School free from interference. *Pickering,* 391 U.S. at 568, 88 S.Ct. 1731; *see White Plains Towing Corp. v. Patterson,* 991 F.2d 1049, 1059 (2d Cir.1993) ("[e]ven as to an issue that could arguably be viewed as a matter of public concern, if the employee has raised the issue solely in order to further his own employment interest, his First Amendment right to comment on ... [the issue] is entitled to little weight in the [*Pickering*] balance analysis."); *but see Lewis* 165 F.3d at 162 ("[t]he more the employee's speech touches on matters of significant public concern, the greater the level of disruption to the government that must be shown.").

We agree with defendants that there is a strong public interest in having public education provided by teachers loyal to that service. (Defs. Mem. Supp. Summ. J. at 13.) In order to maintain the effective operation of public schools, the School District, as an employer, must count on having its employees abide by reasonable deci-

sions and respect discipline by superiors. *Rankin v. McPherson,* 483 U.S. 378, 388, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1987) (holding that the court should consider whether the speech at issue "impairs discipline by superiors or harmony among co-workers, has a detrimental impact on close working relationships ... or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise."). We believe the decision to change a teacher's assignment, which is necessitated, as here, by a sudden need in the department, is an ordinary and reasonable decision for a school district to make. Plaintiff's letter was disruptive because it caused many of the parents to become alarmed and call the School. (Pl. Mem. Opp. Summ. J. at 27, n. 7.) It does not take a stretch of the imagination to see how receiving a letter like plaintiff's would undermine the authority of both the principal and the administration. This, in turn, could affect the parents' confidence in and interfere with the proper functioning of the School.

Accordingly, because we find that plaintiff's September 4th letter did not address a matter of public concern, we grant defendants' motion for summary judgment as to plaintiff's second retaliation claim.

Furthermore, because we hold that plaintiff has failed to state a claim for First Amendment retaliation under § 1983, we need not consider defendants' argument with respect to qualified immunity.

### CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment is granted. The action is dismissed with prejudice, but without costs or attorneys' fees.

SO ORDERED.